**METRO–GOLDWYN–MAYER INC.,**
Plaintiff,

v.

**TRANSAMERICA CORPORATION,** Transamerica Financial Corporation, Tracy Investment Company and Kleiner-Bell & Co., Inc., Defendants.

No. 69 Civ. 3296.

United States District Court
S. D. New York.
Aug. 2, 1969.

Davis, Polk & Wardwell, New York City, for plaintiff; Lawrence E. Walsh, Thomas P. Griesa, Bartlett H. McGuire, and Harrison J. Goldin, New York City, of counsel.

Royall, Koegel & Wells, New York City, for defendant Transamerica Financial Corp., Caesar L. Pitassy, New York City, of counsel.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for defendant Tracy Investment Co.; Arthur J. Goldberg, and Martin Kleinbard, New York City, of counsel.

Goldfeld, Charak, Brown, Tolins & Lowenfels, New York City, for defendant Kleiner-Bell & Co., Inc.; Lewis D. Lowenfels, and Francis C. Brown, Jr., New York City, of counsel.

MANSFIELD, District Judge.

Metro-Goldwyn-Mayer Inc. ("MGM"), a Delaware corporation having its principal place of business in New York, is the target of efforts by Tracy Investment Company ("Tracy"), a Nevada corporation having its principal place of business in Las Vegas, to acquire working control of MGM through a cash tender offer of $35 per share to MGM stockholders for 1,000,000 MGM shares

(listed on the New York Stock Exchange) or approximately 17% of MGM's outstanding shares. Purchase of the shares pursuant to tenders would cost Tracy $36,500,000, of which $30,000,000 is to be provided by a loan from Transamerica Financial Corporation ("Financial"), a wholly owned subsidiary of Transamerica Corporation ("Transamerica").

MGM has moved for preliminary injunction restraining Tracy, Financial, Transamerica, and Kleiner-Bell & Co., Inc. ("Kleiner-Bell"), the dealer-manager, from proceeding with the cash tender offer, accepting tenders, or otherwise acquiring MGM stock.

The root of the controversy lies in the fact that the cash tender offer is being financed by Financial, whose parent, Transamerica, owns 99.6% of United Artists Corporation, a major competitor of MGM. MGM claims that defendants' conduct amounts to a combination and conspiracy in violation of § 1 of the Sherman Act, 15 U.S.C. § 1; that the tender offer, if successful and consummated, would have the effect of restraining trade and commerce in violation of § 7 of the Clayton Act, 15 U.S.C. § 18; that the statement filed by Tracy with the Securities & Exchange Commission and its invitation for tenders violates §§ 14(d) and 14(e) of the Securities Exchange Act and regulations thereunder. 15 U.S.C. §§ 78n(d), (e) (also referred to as the Williams Act); and that the role played by Transamerica and Financial in this transaction constitutes unfair competition.

Following our issuance of a temporary restraining order at 4:55 P.M. on July 28, 1969, affidavits were submitted by the parties and on July 30, 1969 the motion for preliminary relief was brought on for a hearing at which counsel for plaintiff, Tracy and Financial were heard. Neither side sought to offer additional proof, or to cross-examine those subscribing to affidavits introduced by the other. On this record we conclude that preliminary relief, to the limited extent set forth below, is warranted; otherwise the motion is denied.

The essential facts, as revealed in the papers submitted by the parties and upon oral argument, are not in substantial dispute. Transamerica, a conglomerate, is engaged in the business of providing services in various fields, including insurance, financing, motion pictures, television, theatrics, education, real estate, travel and certain manufacturing operations. Its wholly owned subsidiary Financial, as its name suggests, conducts a finance business engaged primarily in consumer lending, financing of retail, automotive and installment sales, plus some commercial financing, the latter of which has accounted for 15% of its gross business.[1] Tracy is engaged principally in the ownership and operation through affiliates and subsidiaries of the Flamingo Hotel and International Hotel in Las Vegas, Nevada. Its sole stockholder is Kirk Kerkorian, Chairman of its Board.

On July 17, 1969, Financial and Tracy executed a "Memorandum of Intent" whereby Financial agreed to lend up to $30 million to Tracy for a period of nine months for the purpose of enabling Tracy to acquire shares of stock in a company listed on the New York Stock Exchange. At that time neither Transamerica nor Financial knew that Tracy planned to use the proceeds to purchase MGM stock. The finalized loan agreement was executed on July 24, 1969, and although it did not refer specifically to MGM, it was known to Financial by that date that the proceeds were to be used to purchase MGM shares. On July 22, 1969 a statement with respect to the tender offer was filed with the SEC pursuant to § 14(d). Amendments were subsequently filed on July 24, 25 and 28. The invitation for tenders was first published on July 23 and advertisements ap-

---

1. According to Financial's consolidated balance sheet, as of December 31, 1968, commercial loan receivables amounted to $79,535,543 out of a total finance receivables of $651,998,918.

peared in the New York Times and Wall Street Journal on that date. It provided that the last day upon which shares could be tendered was to be August 4, 1969 and the final day for withdrawal July 29. On July 26, 1969 the invitation was extended to August 8, with the last day for withdrawal August 6. On July 29 advertisements appeared in the New York Times, the Wall Street Journal, and the Los Angeles Times announcing the extended invitation and incorporating certain information added to Tracy's § 14(d) statement by amendment No. 3.

Under the loan agreement as consummated on July 24, 1969, Financial agreed to make a fully secured loan to Tracy of up to a maximum amount of $30 million, the proceeds to be used solely for the purchase of securities listed on the New York Stock Exchange and the loan to mature on May 4, 1970. According to a formula set forth in the agreement, the rate of interest was to be about $3\frac{1}{2}\%$ above the prime interest rate, which would amount, at current prime interest rates, to a total rate of approximately 12% per annum. The agreement contains no restrictions on Tracy's capital, existing or future borrowings, credit arrangements, business or operations. Until default Tracy would retain voting control over shares to be acquired or pledged as collateral. Except for rights given to Financial with respect to collateral in the event of default, the agreement does not give Financial any control of Tracy or any rights with respect to its business or its actions as a stockholder of MGM. The loan was to be personally guaranteed by Kirk Kerkorian, Tracy's Board Chairman and sole shareholder, who swears in an affidavit that he has a present net worth in excess of $250 million.

Turning to the collateral provisions of the loan agreement, which MGM contends to be of particular significance upon this motion, Tracy agreed to pledge and deliver to Financial, as security for repayment of the loan, 4,347,827 shares of the common stock of International Leisure Corporation ("ILC"), a Nevada company whose shares are traded over-the-counter, together with such shares as would be acquired by Tracy through use of the loan proceeds, which of course, would include the MGM shares to be acquired by Tracy pursuant to the proposed tender offer. The agreement further provided that if the bid price of the ILC stock should decline to less than $3\frac{1}{3}$ times the total loan commitment, Tracy would pledge and deliver additional shares of ILC stock or cash sufficient to re-establish the $3\frac{1}{3}$ ratio. It was further agreed that in the event of Tracy's default Financial could look to either Kerkorian personally, the ILC shares, or the MGM shares, and was empowered to purchase the MGM shares for its own account or sell them by way of foreclosure at a private or public sale. Until default Financial was to have no right to vote the collateral, including the MGM stock, prior to default.

ILC, owner of certain resort properties, is a Nevada corporation controlled by Tracy and Kerkorian. The 4,347,827 ILC shares pledged by Tracy with Financial to secure the loan represent 82% of ILC's outstanding stock. The stock is traded over-the-counter to the extent of transactions on the part of the owners of the remaining 18%, and it was on the basis of its quoted over-the-counter price that the 82% pledged with Financial was valued at five times the amount of the $30 million loan. Since the 82% was owned by a control person, registration under the Securities Act would be required as a condition to a foreclosure sale of the collateral by Financial. Apparently with this possibility in mind Tracy agreed in the loan agreement to use its best efforts to prepare and process any registration statements that might be required.

Except for the loan agreement there is no evidence of any present business relationships, agreements or arrangements between the Tracy-Kerkorian interests and Transamerica or any of its subsidiaries or affiliates. For a period of about one year up to approximately six weeks ago, Kerkorian, the chairman

and sole stockholder of Tracy, owned approximately 3% of the outstanding stock of Transamerica, worth about $86 million and making him its largest single stockholder. He has never been an officer or director of Transamerica, however, and presently owns no interest in it.

The invitation sent by Tracy to MGM stockholders for tender of 1,000,000 common shares of MGM, as extended, states that Tracy's purpose is to "acquire working control" of MGM and to seek appropriate representation on its Board and in its management. It further discloses that Kerkorian is Tracy's sole stockholder and chairman, and that of the $36,500,000 required for consummation of the stock purchase, $30,000,000 will be obtained by loan from Financial, guaranteed by Kerkorian and secured by pledge of securities including the tendered shares. The invitation does not, however, reveal Transamerica's control of United Artists Corporation or that the latter is a major competitor of MGM.

It is against the foregoing background that we consider the various grounds urged by MGM in support of preliminary injunctive relief, which may be invoked by the target corporation, Electronic Speciality Co. v. International Controls Corp., 409 F.2d 937 (2d Cir. 1969). The function of such relief is to maintain the status quo pending final determination of the merits, Hamilton Watch Co. v. Benrus Watch Co., 206 F. 2d 738, 742 (2d Cir. 1953), and it should be granted only upon a clear showing of probable success and irreparable injury. Clairol, Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir. 1968), or, where the balance of hardships tips sharply toward plaintiff, a showing that serious questions going to the merits are raised that warrant a more deliberate investigation and trial. Checker Motors Corp. v.

Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969). On the one hand, we must be leary of trumped up or trivial charges; on the other, we must recognize that in the early stages of a dispute varieties of relief may sometimes be fashioned to avoid irrevocable harm that cannot be remedied later for the reason that by that time it has become impossible to "unscramble the eggs." Electronic Speciality Co. v. International Controls Corp., *supra* 409 F.2d at p. 947.

MGM's case, whether asserted in terms of the Sherman, Clayton or Securities Exchange Acts, is founded on the premise that it is wrong for one competitor (the Transamerica-United Artists group [2]) to finance the acquisition of working control of another (MGM), or even to become a major creditor of a company acquiring such control (Tracy), particularly without full disclosure of these relationships. Such an arrangement, MGM argues, should be restrained for the reason that its effect, regardless of the parties' intent, "may be to substantially lessen competition" in violation of § 7 of the Clayton Act; and, in view of the competitive threat posed, the relationship with United Artists and the latter's competition with MGM represent material facts required to be disclosed in statements filed pursuant to § 14(d) of the Exchange Act.

Without doubt the acquisition by the Transamerica-United Artists group of working control of MGM would violate § 7 of the Clayton Act. It is not disputed that United Artists and MGM are competitors in more than one line of commerce. In one of these lines, the production and distribution of motion pictures, the two firms are among the seven companies which account for 77.3% of the industry's production. The gross film rentals of MGM and United Artists for fiscal year 1968 were $135 million

---

2. For purposes of analyzing plaintiff's contentions we consider United Artists, Transamerica (which controls 99.6% of its stock) and Financial (which is 100% owned by Transamerica) as one. The co-chairmen of the Board of Directors of United Artists are also directors of Transamerica, and the president of Financial is also a vice president of Transamerica, according to a prospectus published by Transamerica on June 17, 1969.

and $116 million, respectively. In their production and distribution of motion pictures they are engaged in intense competition for services of producers, playrights, script material, directors and other creative personnel. They competitively seek distribution of motion pictures to theatres throughout the United States and abroad and have branch offices in most of the major cities of the United States. Furthermore, they compete directly for the licensing of motion pictures to television stations and in the television syndication business, as well as in the production and distribution of phonograph records, in the acquisition and development of musical copyrights and in the production and sale of sheet music. Under any current test, a horizontal merger between these two firms would result in the probability of a substantial lessening of competition which is proscribed by § 7. United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964).

Although MGM's competitor, the Transamerica-United Artists group, may not presently intend to acquire from Tracy the MGM shares that would constitute working control if Tracy's tender offer should be successful, the Financial-Tracy loan agreement poses the threat of such acquisition. It obligates Tracy to repay the loan on May 4, 1970, and, in the event of default, authorizes Financial to purchase the MGM shares for its own account. Although the loan, in the event of default, would also be secured by apparently substantial collateral in the form of a large block of ILC stock and Kerkorian's personal guarantee, Financial would have the exclusive and final decision as to whether it preferred acquiring the MGM stock, and the record reveals circumstances that might, assuming a default, lead it to choose that course. A foreclosure sale of the ILC shares, which represent 82% of its issued stock, might pose problems. Since the market value used for collateralized purposes is based upon limited

trading of the balance of 18% (of which insiders may hold a substantial part) on the over-the-counter market, there is no assurance that in such thin over-the-counter trading, with a declining market, the value of the ILC shares would not drop substantially, particularly since they represent such a large percentage of the company's outstanding stock. Furthermore, a foreclosure sale of the ILC shares by Financial would be complicated and delayed by the necessity of registering the shares with the SEC.

The second alternative available to Financial, in the event of Tracy's default, would be to look personally to Kerkorian for repayment of the loan. However, since his personal financial statements are not before us, we cannot assume at this stage of the proceedings that such a course would be a practicable one for Financial to follow in lieu of the much simpler step of securing ownership of the MGM shares.

■ On the record before us we are persuaded that there is substantial likelihood that in the event of default Financial would exercise its right to acquire the MGM shares rather than pursue one of the more cumbersome alternatives. Thus the existing Financial-Tracy loan arrangement poses a threat of violation of § 7. In order to prevent such an occurrence we believe that Tracy should be restrained from proceeding further with the tender offer unless and until the MGM stock is removed as collateral securing Financial's loan to Tracy.

■ Plaintiff contends, however, that such a prophylactic provision would not be sufficient to alleviate the potentially anti-competitive nature of the proposed takeover of MGM by Tracy. It asserts that, even if there is no danger of the MGM stock falling into the hands of Financial, the fact that Financial will be such a large creditor of Tracy poses a substantial danger to competition between United Artists and MGM. In assessing this contention we are mindful of the Supreme Court's admonition that

§ 7 of the Clayton Act "can deal only with probabilities, not with certainties". F. T. C. v. Procter & Gamble Co., 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L. Ed.2d 303 (1957). On the other hand, the mere possibility of anti-competitive effects is insufficient. See Brown Shoe Co. v. United States, 370 U.S. 294, 323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); F. T. C. v. Consolidated Foods Corp., 380 U.S. 592, 603–604, 85 S.Ct. 1220, 14 L. Ed.2d 95 (1964) (concurring opinion of Justice Stewart).

■ Reduced to simpliest terms the essential question before us is: Does the status of a major MGM competitor (Transamerica-United Artists-Financial) as a substantial creditor of the prospective controlling MGM stockholder (Tracy) pose a sufficient threat to competition to run afoul of § 7? In the absence of circumstances indicating a probability that the creditor would use its position to influence MGM through Tracy, we do not believe that such a debtor-creditor relationship should be categorically outlawed as a matter of law.

■ A bare debtor-creditor relationship, standing by itself, gives the creditor no control over the debtor's right to vote its stock. In this respect the relationship differs sharply from those which have been condemned because a company, either by contract, stock ownership, market position or similar factors, possesses the power to control or influence its competitor's decisions. Brown Shoe Co. v. United States, supra (merger); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (contracts); American Crystal Sugar Co. v. Cuban-American Sugar Co., 259 F.2d 524 (2d Cir. 1958) (stock acquisition); See also Denver & Rio Grande Western R. R. Co. v. United States, 387 U.S. 485, 503–507, 87 S.Ct. 1754, 18 L.Ed.2d 905 (20% stock ownership). Proof of intent to restrain competition is not generally required in a case brought under § 7 of the Clayton Act. United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 589, 607, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). We are faced here, however, with a case in which such precedent is of limited usefulness. Where there is an actual horizontal, vertical or "conglomerate" merger, it is possible to point to structural changes in the marketplace which will probably result in diminished competition, quite apart from any intent on the part of the acquired or acquiring companies. A tendency toward vertical integration through merger in an industry, for example, may raise entry barriers by requiring new entrants to come in with a vertically integrated operation. A.B.A. Antitrust Section, Antitrust Developments 1955–1968 80 (1968). Such mergers *inherently* result in the foreclosure of sales to one of the parties by suppliers which formerly were allowed to compete for such business. See Brown Shoe Co. v. United States, 370 U.S. 294, 323–334, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Similarly, "product extension" mergers pose the threats of increased entry barriers and elimination of potential competition, quite apart from any intent by the participants to stifle competition. Procter & Gamble, *supra*, 386 U.S. at 578, 87 S.Ct. 1224. Mergers which foster reciprocal buying policies can also be identified as changes in the marketplace which make it possible for anti-competitive results to flow even in the absence of intent. When one firm acquires a company which sells a product that is purchased by the acquiring firm's suppliers, a symbiotic relationship between the post-merger entity and its suppliers may develop without any explicit agreement, and without the application of leverage. F. T. C. v. Consolidated Foods Corp., 380 U.S. 592, 594, n. 2, 85 S.Ct. 1220, 14 L. Ed.2d 95. In the case before us, however, it is difficult to foresee the probability of anti-competitive effects flowing from the debtor-creditor relationship alone, without proof of circumstances in-

dicating a likelihood that Transamerica or its affiliates either intend or would be able and likely to use pressure or leverage upon Tracy to influence MGM's policies or decisions, or to obtain confidential information from MGM that would be of value to United Artists.

■ In our view, therefore, the question of whether a debtor-creditor relationship must be enjoined as threatening competition in violation of § 7 depends upon whether such probability is revealed by surrounding circumstances, including the expressed purpose of the relationship, the debtor's solvency or insolvency, the terms and size of the loan, the percentage which it bears to the debtor's entire debt and capital structure, the existence or non-existence of other contracts or relationships between the parties, etc.

It would be naive, of course, to believe that a powerful creditor, which has placed a debtor in a position of dependency upon it, would not use its position as leverage to put pressure upon the debtor to conduct its business, including its control over others, in a way that would accord with the creditor's interests. If the evidence revealed such an intent, or if the likelihood of such conduct could reasonably be inferred from the surrounding circumstances, a case for injunctive relief might exist. After review of the evidence relied upon by MGM here, we do not consider it sufficient to warrant more than limited relief designed to protect against abuse of the debtor-creditor relationship between the defendants, rather than the broad relief sought by MGM. ·

Some circumstances, it is true, raise questions and indicate a possible intent on the part of the Transamerica-United Artists-Financial interests to influence Tracy in the exercise of working control of MGM. For instance, at least one of Financial's officers was aware before the loan agreement was finalized on July 24, 1969, that MGM was to be Kerkori-

an's target. Yet the parties continued the arrangement for pledging the MGM stock with Financial. Furthermore, the loan was not an ordinary one for Financial, which dealt almost entirely in consumer-type financing. Financial's total accounts receivable as of December 31, 1968 were $661.9 million, of which only $79.5 million, or 13% were represented by commercial loans. The $30 million loan would amount to 36% of Financial's total outstanding commercial loans as of the end of 1968, which raises the question of whether Financial went out of its way to extend such a loan to Tracy in the hope that by doing so it might have some influence in Tracy's control of MGM. Although MGM urges, as further evidence, that the 12% interest rate charged by Financial was substantially below the figure which Financial, as a personal finance company, could earn on installment loans, which counsel estimated at 18%, no evidence was offered to support this statement, which is sharply disputed by defendants who argue that a fully collateralized commercial loan of this magnitude represented at 12% a very satisfactory piece of business from Financial's standpoint. MGM points also to Kerkorian's prior interest as a Transamerica stockholder and his continuing business relationship with it as posing the probability that he will in the future impart to Transamerica confidential trade secret information with respect to MGM's business. Lastly, MGM points to the fact that the loan matures in May of 1970 and Tracy has not advanced any present plans for refinancing, absent which Financial might have considerable power over it.

As against these circumstances, officials of Transamerica and Financial have furnished affidavits expressly disavowing any intent to influence the affairs of MGM in any manner. They swear that the loan negotiations, including the Memorandum of Intent, which committed Financial to lend the $30 million, were conducted without any knowl-

edge on their part that Tracy planned to use the proceeds to seek working control of MGM and that it was not until after the commitment had been executed by the parties on July 17, 1969, that they learned for the first time that MGM was involved. They further state under oath that their motive was simply to earn substantial interest on a well secured loan at a rate considered advantageous to Financial; that except for the loan agreement neither Transamerica nor any of its affiliates has had any business dealings with Tracy or any of its officers; and that neither Tracy nor the Transamerica interests own or control any stock in each other. They also point to the absence of any terms in the loan agreement itself or elsewhere giving Transamerica, Financial or any of their subsidiaries and affiliates the right to exercise control or influence over Tracy's stock in MGM or, for that matter, the right, either as a creditor or otherwise, to veto or participate in Tracy's business operations or decisions. Tracy's balance sheet or operations statement were not furnished, however, so that we are left in the dark as to its debt and capital structure, and the part played by the $30 million loan.

Lastly, defendants urge that in view of the substantial amount of other collateral securing the loan to Tracy, and Kerkorian's affidavit to the effect that his net worth is in excess of $250 million, there is no substantial likelihood that Financial would have any of the leverage power suggested by MGM.

■ In view of the prohibition against pledging of MGM stock to secure the Financial-Tracy loan, the circumstances before us do not disclose a sufficient probability of violation of the antitrust laws to warrant the broad relief demanded by MGM. However, more limited relief against the anti-competitive misuse of the Financial-Tracy relationship does appear justified, including a provision prohibiting Transamerica, Financial, and their affiliates, officers, agents and employees, as long as the Financial-Tracy relationship complained of exists, from communicating with Tracy or MGM or any of their affiliates, officers, agents or employees, with respect to any affairs of MGM, or accepting employment as an officer, director, or in a management policy capacity, with Tracy or MGM.

In reaching the conclusion that limited preliminary relief will be granted pursuant to MGM's antitrust claims, we have considered carefully defendants' contention that no irreparable harm to MGM is demonstrated in this case. The harm to a plaintiff seeking to enjoin a violation of § 7 of the Clayton Act does not have to be related to harm to the public toward which the statute is directed. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 743 (2d Cir. 1953). Where a corporation is the target of a takeover bid, its management is subjected to a variety of pressures which may well impair the operations of the company itself. Some of these pressures have been delineated in detailed affidavits submitted by MGM, which present a picture of the usual disruption of management, unsettling of relations with employees, producers, directors, artists and others, all of which is aggravated by the fear of loss of competitive information to United Artists if the proposed takeover should succeed.

Although much of this type of injury may be occasioned by any takeover bid, however lawful, and we recognize that management has no vested interest in its own perpetuation, we cannot say that the injury is not attributable in substantial part to defendants' threatened anti-competitive activities in pledging MGM stock with its competitors, with the risk that MGM's competitive position will thereby be impaired, see Hamilton Watch Co. v. Benrus Watch Co., *supra*, 114 F.Supp. 307, 317 (District Court opinion, per Hincks, C. J., 1953).

Since it is impossible to tell whether the ultimate result of any takeover will

be beneficial or detrimental to the corporation and its stockholders, and, if detrimental, the damage will be difficult to undo after the fact if a final conclusion of illegality is reached, the better course is to grant limited preliminary relief. See Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969); Studebaker Corp. v. Gittlin, 360 F.2d 692, 699 (2d Cir. 1966). In this case the irreversible nature of the potential damage to MGM far outweighs the delay in defendants' plans which will be caused by the necessity for amendment of the loan agreement to exclude the MGM shares as collateral.

Having determined that limited relief is necessary on the antitrust claims submitted by plaintiff, we turn to the question of whether any violations of the Williams Act call for more complete relief. Plaintiff has narrowed its contentions with respect to the Williams Act considerably in its Proposed Findings of Fact submitted on the day after argument. These contentions are now three:

■■ First, it argues that the statements filed with the SEC and advertised in major newspapers are deficient in that they fail to disclose the relationship of Transamerica to United Artists, the competition between MGM and United Artists, and the possible illegality of the proposed plan of financing. Whether or not these omissions are sufficiently material to justify injunctive relief turns upon whether or not "any of the stockholders who tendered their shares would probably not have tendered their shares", Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840, 843 (2d Cir. 1967); Electronic Specialty Co. v. International Controls Corp., su-

pra, 409 F.2d at 948, if the statements had contained the omitted matter. We are not persuaded that disclosure of the fact that Transamerica controlled United Artists, a competitor of MGM, would have induced any tendering stockholder to hold his shares.[3] In any event such information, if this tender offer is to proceed any further, will be disclosed to the stockholders of MGM, since the order will provide, as a condition to proceeding further with the tender, that a copy containing a reference to Transamerica's control of United Artists' Corporation, be sent to MGM's stockholders with a statement that the loan agreement has been amended to eliminate the requirement for pledging MGM shares with Financial.

MGM's second and third Williams Act contentions are of the same general nature. MGM asserts that two statements made by Tracy are not fully explained and therefore misleading: (1) that it is committed to accept one million shares if tendered but may accept more; and (2) that it intends to obtain working control of MGM. MGM argues that Tracy is required to state how it will finance the purchase of any shares beyond the one million commitment, and in what manner it intends to obtain working control. To ask for this information at this point, however, would appear to call for speculation. Kerkorian's affidavit indicates that he does not at this time know how the objective of obtaining control of MGM will be attained. The tender offer does not commit Tracy to purchase more than one million shares, and presumably there are no present plans for financing additional purchases. If there are any such plans, they should be disclosed and the Court will so direct, but if there are none, we will not require disclosure of this negative fact.

3. Presumably a stockholder might be influenced to tender his stock at $35 per share (substantially higher than its current market) if he believed that the takeover would benefit United Artists at MGM's expense. But the test of materiality provided by *Symington Wayne* and *Electronic Specialty* is whether any stockholder who tendered would *not* have done so if the information had been disclosed. MGM has not urged that the information, if disclosed, would have led any stockholder not to tender his shares.

## Conclusion

MGM's motion is granted to the limited extent that a preliminary injunction will issue:

(1) Restraining defendants from further proceeding with the tender offer until the Financial-Tracy loan agreement is terminated or amended to provide that any MGM shares acquired by Tracy will not be delivered or pledged with Financial, its parent Transamerica, or any of their affiliates;

(2) Providing that if the Financial-Tracy loan agreement is so amended, Transamerica, Financial, their affiliates, officers, agents and employees, as long as the amended agreement exists, shall be prohibited from engaging in any communication to, with or from Tracy, MGM or any of their affiliates, officers, agents or employees with respect to any business or affairs of MGM, and, in the case of officers, agents or employees, from accepting employment by Tracy or MGM as an officer, director or in any capacity involving management duties of a policy nature;

(3) Providing that if the tender offer is resumed, a copy of this Court's order containing a reference in the recitals to Transamerica's control of United Artists Corporation will be transmitted to MGM stockholders, together with a statement advising them as to the amendment of the loan agreement; and

(4) Providing that if Tracy has any present plans for the financing of purchases of shares of MGM in excess of the one million to which it is committed under the tender offer, it shall disclose those plans to MGM's stockholders.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ. P. In the event that any findings have been overlooked, supplemental findings may be submitted by the parties.

Submit and settle order pursuant to Rule 65(d), F.R.Civ.P.