Gerald D. BRODER and Constance Broder, Plaintiffs,

v.

Oscar DANE et al., Defendants.

No. 74 Civ. 4585 (LWP).

United States District Court, S. D. New York.

Nov. 21, 1974.

**1314**

Burton L. Knapp and David Bromberg, New York City, for plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Martin Kleinbard, Mark A. Belnick and Jack D. Novik, New York City, of counsel), for defendants.

## OPINION

CANNELLA, District Judge:

Plaintiffs' motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction restraining Inland Credit Corporation ("Inland") from consummating its presently pending "Exchange Offer to Holders of Class A Stock $1 Par Value" (the "Exchange Offer"), is granted pending disclosure by Inland in conformity with this decision.

## INTRODUCTION

Gerald and Constance Broder, owners of 393 shares of Inland Class A common stock have brought this action on behalf of themselves and all other holders of Inland shares similarly situated, alleging violations of Sections 10(b), 13(d), 14(d) and 14(e) of The Securities Exchange Act of 1934, as amended, as well as New York common and statutory law. It includes in addition, a derivative claim.

On October 24, 1974, plaintiffs noticed this motion, and on November 8, 1974 a hearing was held and completed with the presentation of oral argument by counsel. Neither party chose to present

witnesses,[1] and the matter was submitted to the Court on November 12, 1974 with the filing of final reply papers.

## FACTS [2]

Inland Credit Corporation, a New York corporation in the commercial financing business listed on the American Stock Exchange, is attempting to go "private." In an attempt to effectuate this goal, Inland on October 4, 1974, made an exchange offer to its public stockholders. This offer, originally scheduled to expire on October 29, 1974, has been extended pending the determination of this motion.

There are presently 761,016 shares of Inland Class A stock outstanding, of which approximately 70% (525,851 shares) are held by Inland's management and their families. The remaining 30% of the outstanding shares are held by 1,500 public shareholders.

Oscar Dane and Stanley Stern are Inland's principal shareholders, as well as the Chairman of its Board of Directors and President, respectively. They and their families (Stern is Dane's son-in-law) own 69% of Inland's outstanding stock (523,851 shares). The remaining named defendants own approximately 2,000 shares of the company's outstanding stock.

On January 11, 1973, when the market price of Inland was $5.50 per share, Dane and Stern formed the Stern-Dane Holding Company, the principal if not sole asset of which is apparently 483,222 shares of Inland stock (approximately 63% of the corporation's outstanding stock). Simultaneously with the formation of the Stern-Dane Holding Company, Stern purchased 83,860 shares of Inland Class A common stock from six individuals and four accounts held in trust. All of the sellers were apparently related to Mr. Dane either by blood or marriage. As consideration for these shares, an "original" value of $11.27 per share was agreed upon, payable to the sellers, 20% down and the balance payable in four annual installments commencing January 1, 1974 with 6% inter-

1. The facts upon which this decision is based have been taken from the affidavits and documentary evidence submitted by the parties, as well as "defendant's stipulation of facts for purposes of plaintiffs' preliminary injunction motion only," and the transcripts of depositions taken by plaintiffs of Oscar Dane and Stanley Stern. The decision by both parties not to present evidence through witnesses has not proven troublesome in that in its present posture, this case involves "no serious dispute about the facts; the issues, perhaps very troublesome ones, concern the meaning and applicability of a statute . . . .. The taking of evidence would serve little purpose . . . ." SEC v. Frank, 388 F.2d 486, 490 (2d Cir. 1968). *See also* Int'l Controls Corp. v. Vesco, 490 F.2d 1334, 1341 (2d Cir.), cert. denied, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974). *Compare* SEC v. Spectrum, 489 F. 2d 535, 541 (2d Cir. 1973).

2. For the purposes of this motion, the Court will consider only that claim which alleges that the Exchange Offer omitted material information in violation of Section 14(e) of the Williams Act, leaving all other issues raised by the complaint for later disposition. Although plaintiffs' complaint includes six counts and contains numerous allegations, the Court, without expressing any opinion on their ultimate merits, believes that none of the claims, even if true, save that relating to material omissions in the Exchange Offer are of a nature demanding the issuance of an injunction. The weightiest and most seriously advanced of plaintiffs' other claims involves an alleged violation of Section 13(d) (one of the reporting and disclosure provisions of the Williams Act) as a result of defendant Stern's failure to report various holdings and purchases by his wife. In the context of this case, however, where Stern openly owned or controlled 63% of Inland's outstanding shares, the unreported ownership and acquisition of an additional 5% while possibly amounting to a cognizable violation of 13(d) (*see* Mosinee Paper Corp. v. Rondeau, 500 F.2d 1011, 1016–1018 (7th Cir.) petition for cert. filed 43 U.S.L.W. 3240 (U.S. Oct. 12. 1974) (No. 74–415)) does not "represent a potential shift in corporate control" (GAF Corp. v. Milstein, 453 F.2d 709, 717 (2d Cir. 1971) or prejudice or injure these plaintiffs so as to warrant injunctive relief. (*Compare* Graphic Sciences, Inc. v. International Mogul Mines, Ltd., [Current] CCH Fed.Sec.L.Rep. ¶ 94,834 (D.D.C. Oct. 21, 1974) (where a potential struggle for corporate control was involved).

est from November 1, 1972 on the unpaid principal. The $11.27 per share price which was derived from the book value of a share of Inland on October 31, 1972, is, however, subject to an adjustment so that the total amount eventually paid by Stern for each share will be "the book value of a share of Common Stock as of October 31, 1972, retroactively determined as of October 31, 1975. . . ." In essence, this adjustment will be effected through a reconstruction of the October 31, 1972 balance sheet with the aid of hindsight as available on October 31, 1975. While it is, of course, impossible to state exactly what the adjusted figure will ultimately be, it seems clear that barring substantial unanticipated defaults in presently outstanding loans, any required adjustment will be minimal.

Having completed these transactions with an initial payment totaling $191,256.52, Stern contributed his newly acquired 83,860 shares and Dane the 376,352 shares he previously owned so that the Stern-Dane Holding Company held 483,322 shares of Inland stock.[3] The Stern-Dane agreement provided that all Inland shares contributed by the partners would be valued at $11.27 per share subject to the adjustment discussed above. Upon the death, insanity, insolvency or bankruptcy of either partner, the other is afforded the option to purchase all of that partner's stock at $11.27 per share as adjusted. If that option is not exercised, the estate of the deceased, insane, insolvent or bankrupt partner can either require such a purchase, or, in the alternative, itself purchase the other's shares. All of the above facts regarding the purchases by Stern and the formation of the Holding Company were disclosed in an accurate and timely fashion on January 17, 1973, with the filing by Stern of a Schedule 13D pursuant to Section 13(d)(1) of the

Williams Act. Attached to the Schedule 13D was a copy of the Stern-Dane partnership agreement and a copy of a typical stock purchase agreement used by Stern in acquiring his shares.

On October 4, 1974, Inland sent the instant Exchange Offer to its shareholders. The Offer invites all owners of Inland Class A Common Stock to tender their stock back to the corporation in exchange for 10% non-convertible subordinated debentures due 1984 and having a principal value of $5.00. For each share of Inland so tendered, the shareholder will receive one such debenture in exchange.

The Offer provides for a maximum repurchase by the corporation of 190,000 shares, and states that the holders of 523,851 shares (the Stern-Dane Holding Company (483,222 shares) and Stanley Stern's wife and children and trusts for the benefit of said children (40,629 shares)), "have indicated their intention not to tender such shares." Thus, there are a total of 237,165 shares outstanding which may be tendered in response to the Exchange Offer. If all 190,000 shares for which the Offer has been made were to be tendered, there would then be 47,165 shares of outstanding stock publicly held by other than members of Stern's family.

*Inter alia,* the Exchange Offer states: 1) that in light of the present economic climate "there are few advantages and substantial disadvantages, to the company and its shareholders, of the company continuing to be publicly held and required to prepare and file reports with and to observe all the regulations of The Securities and Exchange Commission and The American Stock Exchange. While the present market price for the Class A Stock is depressed, in the opinion of management the prospects of a substantial increase in the market price in the foreseeable future

---

3. The partnership agreement provided that Stern would exercise sole control over the business of the partnership with the exception that he could not sell any of the stock owned by the partnership, or vote to merge, consolidate, or sell substantially all of the assets of, or liquidate, any corporation in which the partnership owned 5% or more of that corporation's stock, without the approval of Dane.

appear limited;" 2) that there is no established market for the debentures and that "there can be no assurance that such a market for debentures will develop;" 3) that even without the Exchange Offer the company was subject to delisting by The American Stock Exchange, and that after the Exchange Offer "the company may also fall below the other listing standards. In any such event, the Class A Stock may be delisted by the Exchange;" 4) under the heading of "Effect of Exchange Offer," there is basically nothing more than a table which shows that the net tangible book value per share before the exchange is $11.73, while after the exchange, if all 190,000 shares are tendered, it will be $13.97.

### THE LAW

### THE STANDARD FOR PRELIMINARY INJUNCTIONS

■ It is settled in this Circuit, that a preliminary injunction will issue

> only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting preliminary relief.

Sonesta Int'l Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973). *Accord*, Missouri Portland Cement Co. v. Cargill, Inc., 498 F.2d 851, 866 (2d Cir.), cert. denied, —— U.S. ——, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); Gulf & Western Industries, Inc. v. The

Great Atlantic & Pacific Tea Co., 476 F.2d 687, 692–693 (2d Cir. 1973); General Host Corp. v. Triumph American, Inc., 359 F.Supp. 749, 753 (S.D.N.Y. 1973).

■■ In considering plaintiffs' motion for a preliminary injunction, the Court will apply the alternative standard set forth above. In order to satisfy the demands of this test, a plaintiff does not have to demonstrate the probability of success on the merits and the possibility of irreparable injury, but only sustain the somewhat lesser burden of (a) presenting substantial and serious questions going to the merits, and (b) convincing the Court that it will be decidedly more onerous to plaintiff to deny it injunctive relief than it will be burdensome to defendant if such relief is granted.[4]

### 1. *Serious Questions Going to the Merits*

■ On a motion for a preliminary injunction, the Court is not required to render a decision on the merits as to the allegations in plaintiffs' complaint that defendant violated 15 U.S.C. § 78n(e) (14(e) of the Williams Act)[5] in failing to disclose the terms of the Stern purchases of January 11, 1973, rather, the Court must only find on the evidence presented, that the Broders' "allegations [are] of sufficient substance to warrant an examination of the other requirements necessary to the grant of preliminary injunctive relief." (Gulf & Western Indus., Inc. v. Great A. & P. Tea Co., Inc., 476 F.2d at 693).

Plaintiffs' complaint, although containing six counts and numerous miscellaneous allegations, basically argues that

4. Dino De Laurentis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373, 375 (2d Cir. 1966); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); *see also* Judge Bazelon's formulation in District 50, UMW v. Int'l UMW, 412 F.2d 165, 168 (D.C.Cir. 1969).

5. § 14(e) reads, in relevant part as follows: It shall be unlawful for any person to make any untrue statement of a material

fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

the Exchange Offer is false and misleading in violation of 14(e) in that it fails to disclose that in January of 1973 Stern purchased shares from members of Dane's family at $11.27 per share. The issue, then, before this Court on a motion for a preliminary injunction is whether or not this failure to so state constitutes a material omission within the meaning of Section 14(e).

In evaluating the substantiality of plaintiffs' claims, it is important that the primary aim of the Williams Act be kept in mind. In enacting this legislation, Congress was responding to the fact that the tender offer mechanism, the use of which had burgeoned in the 1960's, was substantially unregulated by the securities laws as they existed prior to 1968. As a result, shareholders to whom a tender offer was directed, often found themselves making a decision as to whether or not to tender without the benefit of an adequate factual foundation upon which to ground that decision.

In an effort to remedy this situation and to protect the shareholder to the fullest extent possible, the Act demands "full and fair disclosure for the benefit of investors."[6] Concomitantly, the often adverse interests represented by the offering company, and management of the target company, were duly considered.[7] Thus, as the Report of the Senate Committee on Banking and Currency stated,

> [t]he committee has taken extreme care to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. The bill is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case.[8]

■ It is important to note, that in the instant matter, none of the countervailing interests sought to be protected by Congress are present save that of providing full disclosure to investors receiving the offer. Here, there is neither an outside corporation attempting to take over Inland, nor a group of dissident minority insiders seeking to wrest control from incumbent management. In such circumstances, it is this Court's belief that in giving content to the Williams Act's broadly phrased antifraud provision (§ 14(e), the "focus of the legislative history" of which, is, as the Court of Appeals for the Fifth Circuit recently stated in Sargent v. Genesco, Inc., 492 F.2d 750, 769 (5th Cir. 1974) "on adequate disclosure to those investors whose tenders are being solicited so that an informed meaningful consideration of the alternatives can be made." See also, H. K. Porter Co., Inc. v. Nicholson File Co., 482 F.2d 421, 424 (1st Cir. 1973); Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 945 (2d Cir. 1969)) it is wholly consonant with congressional intent to place a heavier burden of disclosure and fair dealing upon a corporation and its insiders who are acting in their own behalf than would be justified were this a case involving a contested tender offer.

■ The above conclusion is bolstered by the following interrelated considerations: (1) unlike the situation extant in a tender offer battle between entrenched management and outside interlopers, there are no opposing factions possessing both the incentive and resources needed to challenge and elaborate upon the assertions contained in the initial offer. Thus, "[i]f there is no contest between companies, and target management supports the tender offer, a lower standard of materiality is appropriate, as for other one-sided communications." 1 A. Bromberg, Securities Law: Fraud, § 6.3 (1113) at 124.4 (1969). Cf. Missouri Portland Cement

---

6. S.Rep.No.550, 90th Cong., 1st Sess. 3 (1967).

7. There was also recognition of the argument that from an economic point of view it would be unwise to unduly inhibit corporate takeovers in that they often "serve a useful purpose in providing a check on entrenched but inefficient management." Id.

8. Id.

Co. v. Cargill Inc., 498 F.2d 851, 873 (2d Cir.), cert. denied, —— U.S. ——, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974) (wherein Judge Friendly noted "[c]ourts should tread lightly in imposing a duty of self-flagellation on offerors with respect to matters that are known as well, or almost as well, to the target company; some issues concerning a contested tender offer can safely be left for the latter's riposte.") (footnote omitted); (2) since there is in fact no opposing side here presenting the shareholders with an arguably distorted view of the facts, there is no justification for anything but the most straightforward and fullest disclosure. As such, a higher level of disclosure is attainable without placing any unjustifiable burden upon the purchasing company. Clearly, the nature of a document and the time pressures under which it is prepared are important factors to take into account when evaluating that document's conformity with the constraints imposed by 14(e). (*See,* SEC v. Texas Gulf Sulphur, 401 F.2d 833, 863–864 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L. Ed.2d 756 (1969)). Judge Friendly pointed out the significance of the time and context factors as applied to a hotly contested tender offer in his decision in Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2d Cir. 1969):

> Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders. *These considerations bear on the kind of judgment to be applied in testing conduct—of both sides—and also on the issue of materiality.* (emphasis added)

*See also* Feit v. Leasco Data Processing Equipment Corp., 332 F.Supp. 544, 571 (E.D.N.Y.1971) (suggesting that a

higher standard of disclosure be applied to a prospectus than other less formal documents); (3) as Professor Bromberg has aptly stated, "[a]n issuer making a tender offer for its own shares looks like the most inside of insiders . . . . " 1 A. Bromberg, Securities Law: Fraud, § 6.4(1) (1967). Phrased another way, the issuer attempting to repurchase its own shares "is the insider par excellence." (statement of Professor Stanley Kaplan, in Hearings on S. 510 before the Subcomm. on Securities of the Senate Comm. on Banking and Currency, 90th Cong., 1st Sess. at 132 (1967)). As a result, "[a]n issuer's duty can hardly be less than an outsider's in making a tender offer and should, if anything, be greater than an outsider's because of its complete access to internal information, its ease of communication with security holders, and their expected confidence in the issuer." 1 A. Bromberg, Securities Law: Fraud § 6.4(4) at p. 130 (1967). The Securities and Exchange Commission, in a memorandum submitted during Congressional hearings on the Williams Act reached a similar conclusion.

> [I]t must be recognized that the disclosures which should be made by an issuer making a tender offer for its own shares are entirely different than those which should be made by a third party. For example, an issuer making such a tender offer probably should disclose substantially more information with respect to its own business and prospects than can reasonably be expected of a third party. (Supplemental Memorandum of the SEC in Hearings on S. 510 *supra,* at 202).

■ In determining whether or not there has been alleged a violation of § 14(e) which presents "sufficiently serious questions going to the merits to make them a fair ground for litigation" the Court must begin by looking to principles of liability as developed under Rule 10b–5. In Chris-Craft Industries, Inc. v. Piper Aircraft Co., 480 F.2d 341, 362 (2d Cir.), cert. denied, 414 U.S. 910,

94 S.Ct. 231, 38 L.Ed.2d 148 (1973) the court held that—

> [i]n determining whether § 14(e) violations were committed in the instant case, we shall follow the principles developed under Rule 10b–5 regarding the elements of such violations. In short, we hold that a violation of § 14(e) is shown when there has been a material misstatement or omission concerned with a tender offer and when such misstatement or omission was sufficiently culpable to justify granting relief to the injured party. The key concepts in this formulation are *materiality* and *culpability*. (Footnote omitted)

The facts here are not in dispute. Both parties agree that on January 11, 1973 Stern purchased 83,860 shares of Inland at a price of $11.27 a share. The dispute, however, and the question upon which the outcome of this motion turns, is what significance, if any, do these transactions have to the presently pending Exchange Offer? That is, are they material?

There is some debate in this Circuit as to the proper formulation of the standard of materiality to be applied in cases under Rule 10b–5, § 14(e) and Rule 14a–9(a). In 1970, the Supreme Court in a case brought under Rule 14a–9(a) stated that a misstatement or omission in a proxy statement was material if "the defect was of such a character that it *might* have been considered important by a reasonable shareholder who was in the process of deciding how to vote." Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970) (emphasis added). Then, in 1972, in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) a 10b–5 action, the Court noted that facts were material which "a reasonable investor *might* have considered . . . important . . . " to his investment decision (*id.* at 153–154, 92 S.Ct. at 1472) (emphasis added).

Recently, in Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281 (2d Cir. 1973) a case in which the Court of Appeals for the Second Circuit held that scienter was not an element of liability under Rule 14a–9(a), Judge Friendly rejected the "might have been" standard as setting "too low a threshold" in light of the fact that "negligence suffices to invoke [14a–9(a)] liability . . . ." 478 F.2d at 1302. It was noted in *Gamble-Skogmo* that the issue of materiality had not been a contested one in either *Mills* or *Ute* and that in addition, both cases had cited Judge Waterman's alternative formulation of the materiality standard as expressed by him first in List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), and later reiterated in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), 478 F.2d at 1301–1302 and n. 21. This formulation, which Judge Friendly adopted in *Gamble-Skogmo* states that "the basic test of materiality is whether 'a reasonable man *would* attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question' (emphasis supplied)." (*Gamble-Skogmo,* 478 F.2d at 1302, quoting *List,* 340 F.2d at 462). The *Gamble-Skogmo* court thus held that in a 14a–9(a) case, "a standard tending toward probability rather than toward mere possibility is more appropriate." (478 F.2d at 1302).

Since the decision in *Gamble-Skogmo,* two different panels of the Second Circuit Court of Appeals have noted Judge Friendly's discussion of the "mightwould" distinction, without either accepting it or rejecting it. Thus, in Sonesta In't Hotels Corp. v. Wellington Associates, 483 F.2d 247 (2d Cir. 1973), a case brought under § 14(e), the court stated that,

> [t]he materiality of facts allegedly misstated or omitted depends, in turn, upon whether a reasonable investor

*might* have considered them to be important in deciding whether to accept the tender offer.

483 F.2d at 251 (emphasis added). Then, in Republic Technology Fund, Inc. v. Lionel Corporation, 483 F.2d 540 (2d Cir. 1973), the panel, per Oakes, J., in a case brought pursuant to § 17 and Rule 10b–5, seemingly adopted the "would" standard, while at the same time suggesting that the standard elucidated by Judge Friendly in *Gamble-Skogmo*, was "somewhat higher." (483 F.2d at 551, n. 11).

 In light of the considerations discussed above regarding the scope of § 14(e) as it applies to omissions by an *offeror seeking to repurchase its own stock*,[9] and in light of the fact that § 14(e) does, unlike § 14(a), require some form of scienter, it is this Court's judgment that the instant case calls for the standard of materiality tending more toward a reasonable possibility than toward probability, thus requiring something more than *mere* possibility, but something less than probability.[10] To the extent that a verbal formula is useful, we adopt that employed by the Circuit Court in Sonesta Int'l Hotel Corp. v. Wellington Associates, 483 F.2d at 252.

> The standard of materiality was not whether the non-disclosure was "major," . . . but whether a reasonable stockholder *might* have attached importance to the omitted facts. If these simple facts had been disclosed in the present case, we [would] have no hesitancy in concluding that a reasonable shareholder, contemplating a sale of all or part of his shares, might well have considered the information to be of considerable importance in making his decision.

In this regard, the words of the court in Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 369 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973) are also instructive. There, in a § 14(e) case it was stated that the

> securities laws impose upon an offeror of an exchange offer a duty to act reasonably in discovering facts material to the offer as of the time of the transaction and in *disclosing fully those material facts of which the offeree is presumably unaware and which ostensibly would influence his judgment. Cf.* Kohler v. Kohler Co., *supra,* 319 F.2d at 642.

 Stern argues that the omission was not material and thus not violative of § 14(e) in that it was disclosed in his original Schedule 13D filing of January 17, 1973, and that "the $11.27 figure neither had nor has anything to do with the real or potential market value of Inland stock. It represented a book value that was not only higher than the true market value of the stock (then and now), but that was higher than anything anyone could hope to receive on forced liquidation of the Company." (Stern Affidavit at 13) Stern also notes that the $11.27 figure was not a final one but was subject to adjustment and that in all likelihood such adjustment will result in a decrease of the price. He does not, however, state the amount of this possible decrease. Finally, Stern argues that if in fact the Exchange Offer had noted the $11.27 sale, *"some Inland shareholders might have decided not to participate in the exchange offer* and, indeed, might even have decided to go out and buy up Inland's shares before the market price supposedly skyrocketed. In doing so, however, Inland's shareholders obviously would have been relying on a mistaken belief induced by a misleading disclosure. . . . The fact is that the market simply does not value

---

9. *See* pp. 1318–1320, *supra.*

10. The Court notes the recent decision of the Fifth Circuit Court of Appeals in Smallwood v. Pearl Brewing Co., 489 F.2d 579 (5th Cir.), cert. denied, —— U.S. ——, 95 S. Ct. 134, 42 L.Ed.2d 113 (1974), a § 14(e) case in which the court specifically adopted the "would" standard relying on the *Gamble-Skogmo* analysis. *Id.* at 603–604. The Court declines to follow that decision for the reasons discussed in the text.

Inland's stock in relation of its book vlaue." (Stern Affidavit at 15) (emphasis added).

The Court cannot agree with Stern's conclusions regarding the materiality of the $11.27 per share price. The question of materiality in this case goes to the *price* being offered more than to the decision as to whether or not to tender. This application of the concept of materiality is well illustrated by the facts in Herbst v. ITT, 495 F.2d 1308 (2d Cir. 1974) (although the discussion in *Herbst* centers on the reliance issue, it serves well to illuminate the materiality issue here presented). In *Herbst,* it was alleged that ITT in its exchange offer to holders of Hartford stock had failed to include the material fact that those who exchanged Hartford shares for ITT shares might be taxed on the exchange. The theory of plaintiff's claim was that this fact might prove material not in the sense that it would suggest that Hartford shareholders should absolutely refuse to exchange their shares, but rather, it would be material if "Hartford shareholders would not have exchanged their shares *at the rate offered* if they had known the truth." (495 F. 2d at 1316) The question in this matter is whether the Inland shareholders would consider the information regarding the price arrived at in the January 11, 1973 agreements an important factor in making an informed decision as to how to react to the tender offer on the terms stated. It is possible that such information might have caused Inland shareholders to reconsider both the value of their stock to them, and more importantly, the value of the stock to the corporation.[11] In fact, the defendant himself recognizes the significance shareholders will place upon such a disclosure noting that it might have led some shareholders "not to participate in the exchange offer . . . ." (Stern Affidavit at 15) That, of course, is precisely the point. Defendant argues that book value bears no significant relationship to market value and that disclosure would have misled the shareholders.[12] However, as Judge Wright said in Gould v. American Hawaiian Steamship Co., 331 F.Supp. 981, 992 (D. Del.1971),

> the Court is confident that counsel could have, without difficulty, constructed an accurate representation which was neither unreasonably lengthy nor unduly difficult to comprehend.

■ There is a fact here which has not been disclosed but which should have been. The interpretation of its significance is for the shareholders. It will not do to have corporations deciding that

---

11. *Cf.* Gould v. American Hawaiian Steamship Co., 362 F.Supp. 771, 776–777 (D.Del. 1973) where the court in a merger case found proxy materials materially misleading in that although they revealed that the majority shareholders were to be paid for their shares differently than were minority shareholders—

> [t]he shareholders were not adequately or accurately apprised of the factors relevant to ascertain the appropriateness of any premium and the necessity for the disparate treatment. As a consequence of the proxy defects, the shareholders were never afforded the opportunity to share in the premium received by the favored defendants.
>
> . . . . .
>
> . . . it is similarly equally possible that full disclosure might have resulted in a sharing of the premium. (footnote omitted)

*See also* Feit v. Leasco Data Processing Equipment Corp., 332 F.Supp. 544, 572 (E. D.N.Y.1971).

12. In the alternative, defendants urge, albeit half-heartedly, that there was in fact no omission here in that the precise terms of the Stern-Dane deal and the Stern purchases were detailed in the Schedule 13D filed by Stern on January 11, 1973. Such a contention, however, completely misconstrues the purpose of disclosure. As SEC v. Texas Gulf Sulphur made clear, disclosure means "effective" disclosure. (401 F.2d 833, 854 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). In the context of an exchange offer, effective disclosure per se means disclosure in the offer (or any disclosure having similar impact, e. g., a letter sent to all stockholders).

their shareholders will misconstrue the import of a material fact and therefore unilaterally decide not to mention it at all.

Thus, it is this Court's belief that Inland's failure to disclose in the Exchange Offer that Stanley Stern, the President, Treasurer, principal shareholder and a member of the Board of Directors of Inland, had previously purchased over 80,000 shares of Inland at a price of $11.27 per share, raises substantial questions going to the merits of sufficient seriousness to satisfy the first prong of the applicable standard for the granting of preliminary injunctive relief.[13]

## 2. *The Balance of Hardships*

In evaluating the balance of the hardships, the Court takes cognizance of the repeated declarations by our court of appeals that in tender offer cases the flexible application of a preliminary injunction is often the best manner in which to effectuate the goals of the Williams Act. This is not to say that injunctive relief should be granted lightly, but when a plaintiff raises serious questions going to the merits, and relief can be fashioned which protects the public investor without significantly damaging the offering party, such relief is fully warranted. *See* M.G.M. v. Transamerica Corp., 303 F.Supp. 1344, 1348 (S.D.N.Y.1969) (Mansfield, J.).

In this matter, an injunction permitting the Exchange Offer to proceed on the condition that the omitted material information be disseminated to all shareholders and permitting previously tendering shareholders to withdraw their shares, will serve the purposes of the Williams Act by providing Inland shareholders with full and fair disclosure of all material facts *prior* to the tender of their shares, and by assuring

that the tender offer not be permitted to proceed to fruition until the shareholders are adequately apprised of all material facts necessary to permit them to make an informed judgment as to the advisability of tendering their shares. As Judge Mansfield put it in *Sonesta,* 483 F.2d at 250–251,

preliminary injunctive relief is a particularly useful remedy for prevention of probable violations of the disclosure requirements of the Act, for the reason that prior to consummation of the offer the court still has a variety of methods available to it for correction of the misstatements or omissions. *See, e. g.,* Butler Aviation Int'l. Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 845 (2d Cir. 1970). But once the tender offer has been consummated it becomes difficult, and sometimes virtually impossible, for a court to "unscramble the eggs." Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969); Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Company, Inc., *supra,* 476 F.2d 687, 698. On the other hand, preliminary relief does not, in assuring that the offer will be lawfully made, sacrifice the legitimate desires of shareholders to accept the offer. If the offeror is subsequently vindicated after a trial on the merits, the offer may be renewed. *Thus, in the normal situation, when it appears likely that the offer may contain materially misleading statements or omissions as made, the interest of the shareholders and of the public in full disclosure of relevant circumstances renders preliminary injunctive relief an appropriate method of remedying the deficiencies in disclosure before the offer is consummated.* [Emphasis Added]

---

13. To the extent that the holding in Smith v. Newport National Bank [1970–71 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 93,200 (D. R.I.1971) is inconsistent with this decision, the Court declines to follow it. The rationale of the Smith decision seems to have been

that since the price set by the tender offer was fair there was no violation of 14(e). Nowhere did the Court discuss the issue of materiality, and it is clear that this early 14(e) decision does not accurately represent the state of the law as it stands today.

*Accord Gulf & Western Ind., supra,* 476 F.2d at 698–699; Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 844–845 (2d Cir. 1970); Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969); General Host Corp. v. Triumph American, Inc., 359 F.Supp. 749, 758–59 (S.D.N.Y.1973); Ronson Corp. v. Liquifin, Civ. 785–73 (D.N.J., July 3), aff'd, 483 F.2d 846, 851 (3d Cir. 1973).[14]

■■■ The injunction required by this decision is not one which will result in the demise of Inland's Exchange Offer (*compare* Missouri Portland, 498 F.2d at 870). From Inland's point of view, it will merely cause a delay for the time needed to prepare a supplementary statement in keeping with this opinion. There has been no suggestion by Inland that there are any reasons which would cause Inland not to renew its Offer. At oral argument, counsel for Inland suggested to the Court that any action requiring the Exchange Offer to be extended would harm those Inland shareholders who have already tendered their shares for the 10% debentures which bear interest from November 15, 1974 payable annually on November 15 of each year. While it is of course true that compliance with this Court's mandate will result in again extending the expiration date of the Offer which in turn might result in Inland deciding to change the date from which interest will run, the Court does not believe this to be a factor which in any way tips the balance of hardships.

In granting preliminary injunctive relief in this case the Court is in no way whatsoever making a judgment as to the merits of the Exchange Offer, or as to the "fairness" of the price. The Court is seeking solely "to impose a duty to disclose and inform rather than to become enmeshed in passing judgments on information elicited." Popkin v. Bishop, 464 F.2d 714, 719–720 (2d Cir. 1972).

## CONCLUSION

It is the judgment of this Court that Inland be and hereby is restrained from consummating the Exchange Offer, until it has sent to all shareholders a statement in the form of a supplement to the Exchange Offer (or in its discretion Inland may choose to prepare an entirely new Exchange Offer), stating: (1) the facts surrounding the January 11, 1973 purchase by Stern of the 83,860 shares, specifically explaining the agreement as to price, and (2) that all shareholders who have previously tendered may, if they wish, rescind their tenders.

Submit an order in conformity with the above, including a provision requiring that any statement distributed to shareholders in compliance with this decision be submitted to the Court for prior approval.

14. This line of reasoning was also adopted by Aranow and Einhorn in Tender Offers for Corporate Control 294 (1973),

[t]he recognition that the Williams Act is designed to protect the investing public within a statutory framework which favors neither the offeror nor the target company suggests that the court's primary concern should be that of fashioning relief to promote the protection and interests of security holders. Along these lines, the flexibility inherent in permitting the offer to continue—under conditions which provide, where appropriate, for sterilization of the violation [and] full disclosure, . . . appears to represent a more balanced approach to the problem of relief for violations by the offeror. In this regard, it should be added that the uncertainties which will confront the offeror from a court-enforced withdrawal offer should be more than sufficient to encourage voluntary statutory compliance. (Footnote omitted).