**VANTICO HOLDINGS S.A., Vantico Group S.A., Vantico International S.A., and Vantico, Inc. Plaintiffs,**

v.

**APOLLO MANAGEMENT, LP and Resolution Performance Products, LLC, Defendants.**

No. 03 CIV. 768(JGK).

United States District Court, S.D. New York.

Feb. 28, 2003.

## FINDINGS OF FACT CONCLUSIONS OF LAW

KOELTL, District Judge.

### Introduction

This is a motion for a preliminary injunction brought pursuant to the federal antitrust laws by the plaintiffs, Vantico Holdings S.A., Vantico Group S.A., Vantico International S.A., and Vantico, Inc. (collectively "Vantico"), which are direct or indirect producers of epoxy resin. The plaintiffs seek to enjoin a defendant, Apollo Management, LP ("Apollo"), a private equity investment firm that currently owns a substantial interest in Vantico's Senior Debt, through Apollo Investment Fund IV, L.P., from acquiring any more debt or equity of Vantico, and from voting its interest in Vantico's Senior Debt in a manner inconsistent with the vote of other senior debt-holders or in a manner inconsistent with Vantico's voluntary restructuring plan. In addition, because Apollo, through Apollo Investment Fund V, has a significant investment in Resolution Performance Products, LLC ("Resolution"), a direct horizontal competitor of Vantico that also produces epoxy resin products, the plaintiffs also seek to enjoin Apollo from interfering, in any way, with Vantico's attempt to remain a viable competitor of Resolution and from using and obtaining non-public competitively sensitive information concerning Vantico's operations, or its possible reorganization and bankruptcy.

The plaintiffs seek a preliminary injunction arguing, among other things, that without court action the present holding by Apollo of Vantico debt, with its alleged concomitant ability to derail the voluntary

restructuring plan favored by the other debt-holders and bond-holders of Vantico and to obtain sensitive non-public information about Vantico, in combination with Apollo's control of Resolution, represent an imminent threat to the financial viability of Vantico and to the competitive market for epoxy resin products, and constitute violations of § 1 of the Sherman Act, 15 U.S.C. § 1, § 2 of the Sherman Act, 15 U.S.C. § 2, and § 7 of the Clayton Act, 15 U.S.C. § 18.

The plaintiffs originally sought a temporary restraining order ("TRO"), and after a hearing held on February 4, 2003, the plaintiffs' motion for a TRO was denied. Subsequently, a hearing was held on February 12, 2003 on the motion for a preliminary injunction, and the parties had the opportunity to examine witnesses and submit relevant documentary evidence. Having reviewed the submissions and assessed the credibility of the witnesses, the Court makes the following Findings of Fact and reaches the following Conclusions of Law pursuant to Fed.R.Civ.P. 52(a) and 65.

## FINDINGS OF FACT

### Parties

1. The plaintiffs (collectively "Vantico") are the constituent companies of a highly-leveraged, multi-national corporate entity. (Declaration of Justin Court ("Court Decl.") dated Feb. 3, 2003 at ¶¶ 2–5; Tr. dated Feb. 12, 2003 at 153 (Court).) Plaintiffs Vantico Holding S.A., Vantico Group S.A., and Vantico International S.A. are corporations organized under the laws of Luxembourg. Morgan Grenfell Private Equity Limited ("MGPE") owns the majority of the equity of Vantico Holding S.A., which in turn owns all of the equity of Vantico Group S.A., which in turn owns all of the equity of Vantico International S.A. Vantico International S.A. owns all of the Vantico operating companies. (Court Decl. ¶ 2; Am. Compl. ¶ 4.)

2. The plaintiff Vantico Inc. ("Vantico Inc."), a corporation organized under the laws of the State of Delaware, manufactures and sells epoxy resin products, including structural composites, specialty polymers, coating systems and electrical insulation materials. (Am. Compl.¶ 5.)

3. Vantico, Inc. is a major worldwide manufacturer of epoxy resins, including Basic Liquid Resin ("BLR"), Basic Solid Resin ("BSR"), and specialty resins. (Declaration of Peter Farmakis ("Farmakis Decl.") dated Jan. 31, 2003 ¶¶ 14–20.)

4. Epoxy resins are high-performance thermosetting resins used primarily for protective coatings, electrical laminates and encapsulations, bonding and adhesives, glass fiber-reinforced vessels, pipes and structural materials. (Farmakis Decl. ¶ 2.) In their cured form, epoxy resins possess a number of desirable properties, including outstanding adhesion, excellent resistance to corrosion and chemicals, high tensile strength, good toughness and excellent dielectric properties. (Id.; Tr. at 77–78 (Farmakis).) Surface coatings have traditionally been the largest application for BLR. (Farmakis Decl. ¶ 10.) The major coating applications for BLR include industrial maintenance and marine finishes, OEM automotive primers, beer and beverage can interiors, food can interiors, machinery and equipment and appliances. (Id.) BLR is manufactured from a combination of bisphenol A and epichlorohydrin ("ECH"). (Farmakis Decl. ¶ 8.)

5. In 2000, BLR accounted for the majority of the total U.S. epoxy resin sales

of Dow Chemical Co. ("Dow"), Resolution Performance Products, LLC ("Resolution") and Vantico, Inc. (Farmakis Decl. ¶ 7.)

6. Resolution and Dow are the major worldwide producers of BLR with each having approximately 43% of the United States production and 30% and 26% respectively of the worldwide production in 2000. (Farmakis Decl. ¶ 20.) In 2000 Vantico had 14% of the United States production and 12% of the worldwide production of BLR. (*Id.*)

7. Resolution and Dow are the only two U.S. suppliers of ECH. (Farmakis Decl. ¶ 3.)

8. The defendant Apollo Management, L.P. ("Apollo") is a private equity investment firm that was founded in 1990. (Declaration of Scott Kleinman ("Kleinman Decl.") dated Feb. 7, 2003 at ¶ 2.)

9. Apollo manages several distinct funds, which are administered separately, and distinct fiduciary duties are owed to each of those fund's investors. (Kleinman Decl. ¶ 3.) Two of those funds are Apollo Investment Fund IV, L.P. ("Fund IV") and Apollo Investment Fund V, L.P. ("Fund V"). (*Id.*) The Apollo investors are primarily state and corporate pension funds, university endowments, and other institutional investors. (*Id.*)

10. Although the funds are administered separately, there is overlap between individuals who sit on the board of directors of Fund IV and Fund V. Leon Black, the CEO and principal of Apollo, is the President and Director of both Fund IV and Fund V. (*See* Pls.' Exh. 1 (Chart).) John J. Hannan, a principal of Apollo, is the Vice-President and Director of both Fund IV and Fund V. (*See id.*)

11. As part of its investment activities, Apollo purchases the distressed debt of various companies. (Kleinman Decl. ¶ 3.) Part of these activities involve investments in the chemical sector. (Kleinman Decl. ¶ 2.)

12. One of Apollo's investments in the chemical sector is Resolution Performance Products LLC ("Resolution"), which manufactures and sells epoxy resin product in direct competition with Vantico. (Kleinman Decl. ¶ 3.)

13. Fund IV owns approximately 79% of Resolution Holdings LLC. ("Resolution Holdings") (Defts.' Exh. 4.). In turn, Resolution Holdings owns approximately 91% of RPP Inc. (*Id.*) RPP Inc. is the parent company and owns all of Resolution. (*Id.*) Apollo admits that it has invested in Resolution. (Kleinman Decl. ¶ 3.) Resolution discloses in its annual securities filing that through Apollo's equity interest and the fact that a majority of Resolution's Board of Managers is affiliated with Apollo, Apollo has the power to approve and set the terms of Apollo's engagement, although members of the Board of Managers affiliated with Apollo are aware that their fiduciary duties as Board Members are to Resolution. (*See* Form 10-K dated Dec. 31, 2002 attached as Exh. 4 to Farmakis Decl. at 52.)

14. Joshua Harris, Laurence Berg and Peter Copses, are partners in Apollo, and also sit on the Board of Managers of Resolution. (Pls' Exh. 1.) Scott Kleinman is a principal of Apollo and also sits on the Board of Managers of Resolution. (*Id.*) The members of the Board of Managers of Resolution also serve as the members of the Board of Directors of RPP Inc. (Form 10-K dated Dec. 31, 2002 at 32.) Therefore, Apollo's principals

and partners make up a majority of both Resolution's seven-member Board of Managers and RPP Inc.'s seven-member Board of Directors. (*See id.*)

15. Apollo has invested in Vantico by purchasing, through Fund V, approximately 35% of Vantico's distressed bank debt, which has a face value of $ 160 million. (Kleinman Decl. ¶ 10.)

16. The total dollar amount Fund V has invested in Vantico is greater than the amount Apollo has invested through Fund IV in Resolution. (*Id.*)

*Vantico's Financial Condition*

17. On May 31, 2000, Vantico acquired the performance polymers business of CIBA Specialty Chemicals Holding Inc. and, as a consequence, incurred substantial long-term debt that still burdens Vantico. (Court Decl. ¶ 3.) This debt was incurred principally by Vantico International. (Court Decl. ¶ 10.)

18. As of September 30, 2002, Vantico had total long-term debt totaling CHF 934 million ($682.5 million). (Court Decl. ¶ 3.)

19. The Vantico Group has significant long-term debt including 12% Senior Subordinated Notes (the "Bonds"). (*Id.*) A significant portion of the Bonds, nearly 73%, are held by MatlinPatterson Global Opportunities L.P. ("MatlinPatterson"), and SISU Capital Ltd. ("SISU"). (Court Decl. ¶ 10.) MatlinPatterson is a New York based investment firm specializing in distressed securities. (Kleinman Decl. ¶ 7.) The total value of the Bonds is € 250 million. (Court Decl. ¶ 3.)

20. Payments on the debt currently consume a large portion of Vantico's cash flow: for the twelve months ending December 31, 2001, its net interest expenses were CHF 117 million ($85.5 million) and for the first nine months of 2002 those expenses amounted to CHF 82 million ($59.9 million). (Court Decl. ¶ 4.) Vantico has been experiencing a deterioration in its liquidity situation over the past year and a half. (Tr. at 153 (Court).)

21. On December 14, 1999, Vantico International entered into a debt-refinancing agreement (the "Credit Agreement") with Credit Suisse First Boston ("CSFB"). (Court Decl. ¶ 6.) CSFB, under the Agreement, is to act as Facility Agent, Security Trustee, Issuing Bank, and Lead Arranger. (*Id.*) The agreement, which has been amended on several occasions (most recently on April 19, 2002), provides for a total of CHF 800 million in loans and revolving credit commitments (the "Senior Debt"). (*Id.*) As of September 30, 2002, this Senior Credit Facility had an outstanding principal balance due of CHF 607 million. (Court Decl. ¶ 3.)

22. The Senior Credit Agreement contains a number of provisions that allow holders of the Senior Debt to impact Vantico's business decisions. (Court Decl. ¶ 7.) (Tr. at 163–64 (Court).)

23. The debt obligations of Vantico owed to CSFB and other banks (collectively "the Senior Banks"), are senior to and have priority over the obligations due under the Bonds previously issued by Vantico and held by MatlinPatterson and SISU. (Court Decl. ¶ 2.)

24. Vantico's substantial cash restructuring charges and financial expenses have led to significant negative cash

flows in 2001 and 2002. (Court Decl. ¶ 5.)

25. Vantico has pursued a wide range of options to improve the company's financial situation, beginning in the summer of 2002 and, more recently, in mid-to-late January. (Court Decl. ¶ 10; Supplemental Declaration of Justin Court ("Court Suppl. Decl.") dated Feb. 13, 2003 at ¶ 2.)

26. One such option that Vantico explored with Apollo was the possibility merger of Vantico and Resolution, whereby Resolution would acquire Vantico. (Declaration of Jon MacIntosh ("Macintosh Decl.") dated Feb. 2, 2003 at ¶ 3.) Scott Kleinman and Joshua Harris attended discussions in August 2002 along with Jon Macintosh, a Vantico director and a consultant to MGPE, regarding a possible acquisition by Apollo of Vantico. (Kleinman Decl. ¶ 4; MacIntosh Decl. ¶ 3.)

27. Harris and MacIntosh had previously had a number of other conversations regarding Apollo's desire to merge Resolution and Vantico. (MacIntosh Decl. ¶ 2; Kleinman Decl. ¶ 4.)

28. Before proceeding with discussions, Apollo and MGPE executed a confidentiality agreement dated July 30, 2002. (Confidentiality letter attached as Exh. A to Kleinman Decl.) The agreement also bound Resolution and Vantico, as "connected persons" of the two signatories, respectively. (*Id.*) The confidentiality agreement required that the parties would hold disclosed information in strict confidence and would not disclose, copy, reproduce or distribute any such information to anyone other than authorized recipients. (*Id.*) The information was to be used solely to evaluate, negotiate or advise in con-

nection with the possible merger of Vantico and Resolution. (*Id.*) The Chief Executive Officer of Resolution was the only Resolution employee designated to be authorized recipient of such confidential information. (Confidential letter dated Aug. 8, 2002 attached as Exh. B to Kleinman Decl.)

29. Harris suggested that Apollo/Resolution would be willing to pay a price equivalent to or slightly in excess of Vantico's outstanding Senior Bank Debt. (MacIntosh Decl. ¶ 3.) Such a price could be achieved by a declaration of Vantico's insolvency followed by a purchase by Resolution/Apollo from the bankruptcy administrator. (*Id.*)

30. MacIntosh rejected the August proposal, based on the belief that Apollo's plan would have benefited only Apollo and the other Senior Banks, and would have provided little or no compensation for Vantico's bond holders or other subordinated creditors. (MacIntosh Decl. ¶ 3.)

31. At the time of this proposal, MGPE and Vantico's management and directors expressed concern that any merger between Vantico and Resolution would be blocked because of various antitrust issues. (MacIntosh Decl. ¶ 2.) Despite these concerns, however, in response to the August proposal, the plaintiffs agreed to share information with Apollo to allow Apollo's antitrust counsel to evaluate the proposed merger. (*Id.* at ¶ 4.)

32. MGPE, Vantico, Apollo, and Resolution held several discussions over the next few months in an attempt to "advance Apollo's antitrust analysis". (MacIntosh Decl. ¶ 5.)

33. Apollo lawfully obtained confidential information regarding Vantico pursuant to the confidentiality agreements entered into in connection with the discussions that took place between Vantico, Apollo, and Resolution regarding a potential combination of Vantico and Resolution. (Kleinman Decl. ¶¶ 5, 30.)

34. The information provided by Vantico to the defendants pursuant to the confidentiality agreement was shared with the Chairman of Resolution, as authorized by the confidentiality agreement. Apollo has not shared other confidential information about Vantico with Resolution, including any information Apollo received by a holder of Vantico's senior debt. (Declaration of Marvin Schlanger ("Schlanger" Decl.) dated Feb. 6, 2003 at ¶ 3.)

35. By late Fall 2002, Vantico had concluded that a merger with Resolution was not feasible and sought other solutions to its financial problems. (MacIntosh Decl. ¶ 5.)

36. Despite the fact that the plaintiffs considered a merger and combination between Vantico and Resolution, and pursued those negotiations over a period of several months, the plaintiffs now allege that such a combination would clearly violate fundamental principles and prohibitions of the federal antitrust laws.

*The Voluntary Restructuring Proposal*

37. MatlinPatterson became a majority holder of Vantico's Bonds in or about Fall, 2002. (Court Decl. ¶ 10; Kleinman Decl. ¶ 7.)

38. Vantico's Board reached a preliminary agreement in January 2003 with MatlinPatterson and SISU, the majority holders of Vantico's Bonds, on behalf of all such holders, to engage in a debt-for-equity swap (the "Voluntary Restructuring Plan"). (Court Decl. ¶ 10.)

39. Under the agreement, holders of the Bonds would exchange their debt for 95% of the ordinary equity of Vantico. (Court Decl. ¶ 10.) Holders other than MatlinPatterson and SISU would have an option to exchange their Notes for cash in lieu of shares equivalent to € 300 for each € 1000 of principal outstanding. (*Id.*)

40. MatlinPatterson and SISU, in turn, would provide Vantico with "Bridge Loans" in the amount of CHF 50 million ($36 million) to give it operational liquidity. (Court Decl. ¶ 11.) Vantico expects to draw CHF 25 million from the Bridge Loans during February and the remaining CHF 25 million during March 2003. (*Id.*) In addition, MatlinPatterson and SISU also agreed to provide an additional CHF 75 million during 2004, if such monies are necessary to keep Vantico liquid. (*Id.*)

41. As part of the Voluntary Restructuring Plan, the Senior Bank Debt would continue to exist and would not be impaired. (Court Suppl. Decl. ¶ 7.)

42. However, under the terms of the Voluntary Restructuring, the Senior Bank Debt holders must unanimously consent to defer two amortization payments that are due at times certain. (Court Decl. ¶ 19.) In addition, a majority (2/3) must also agree to allow the Bridge Loans, to be ranked at least *pari passu* with the Senior Bank Debt. (*Id.*)

43. The restructuring can be completed only with the approval of 66⅔% of the Senior Bank debt-holders. (Court

Decl. ¶¶ 11, 16–17, 19; *See* Tr. at 163–64 (Court).)

44. At the closing of the Restructuring, Vantico intends to conduct a CHF 75 million rights issue and use part of the proceeds to repay the Bridge Loans. (Court Decl. ¶ 11.)

45. As a result of the Voluntary Restructuring, MatlinPatterson would become the majority shareholder of Vantico Group, and intends to fold its resulting equity into the Huntsman Group, which is the world's largest privately held chemical company, and in which MatlinPatterson has a significant ownership interest. (Court Decl. ¶ 10; Kleinman Decl. ¶ 8.)

46. At around the end of January, 2003, Vantico entered into an exclusivity agreement with MatlinPatterson and SISU under which Vantico agreed not to propose an alternative to the Voluntary Restructuring Plan to the Banks. Such a restriction was a precondition to MatlinPatterson's and SISU's agreement to this restructuring plan. (Tr. at 176–79, 184–85 (Court).)

47. Apollo opposes the MatlinPatterson and SISU plan because Apollo as a debt-holder seeks to have Vantico consider alternative restructuring proposals, including an auction of all of Vantico's operating companies. Various entities, including MatlinPatterson and Resolution, could participate in an auction process being proffered by Apollo.

48. Any acquisition by Resolution of Vantico in an auction process would require approval by antitrust regulators in the United States, particularly the Federal Trade Commission ("FTC"), and in Europe.

49. Repeated attempts by Apollo to have Vantico consider the possibility of an auction as an alternative restructuring proposal have been flatly rejected by Vantico. (*See, e.g.,* Defts.' Exh. 1 ("Letter dated Feb. 11, 2003"); Tr. at 173–74; 175–76 (Court).)

50. Apollo also opposes the Voluntary Restructuring Plan, because under the plan the bank debt of Apollo and the other bank debt-holders would effectively be diluted by the *pari passu* treatment of the additional Bride Loans that would be extended by MatlinPatterson. (Kleinman Decl. ¶ 15; Court Decl. ¶ 11.) Moreover, the Voluntary Restructuring does not provide for the bank debt holders to recover their principal in the near future, a possibility that remains open with an auction process. (Kleinman Decl. ¶¶ 13–15.)

51. At the end of March, 2003, Vantico is scheduled to pay approximately CHF 15 million primarily to various advisors, including MatlinPatterson, most of which is contingent on the voluntary restructuring being completed. (Tr. at 158–59, 180–81 (Court).)

52. MatlinPatterson has provided the money, in the form of a loan to Vantico, to pay for the present lawsuit. (Tr. at 179–80 (Court).)

*Apollo's Acquisition of Vantico Debt*

53. In mid-December 2002, Apollo, through Apollo Investment Fund V, L.P., acquired a substantial initial position in Vantico's Senior Bank Debt. (Kleinman Decl. ¶ 9; Letter dated Jan. 20, 2003 attached as Exh. F to Kleinman Decl. at 1; Tr. at 163 (Court).)

54. After acquiring this initial position of bank debt, Apollo declared that it opposed the Voluntary Restructuring Proposal, described above, and pro-

posed that Resolution conduct due diligence for a possible acquisition of Vantico by Resolution. (Letter dated Jan. 20, 2003 at 3–5; Declaration of Jason Clarke ("Clarke Decl.") dated Feb. 2, 2003 at ¶ 5.) Apollo insisted that should Vantico not permit such due diligence to go forward, it would not support any amendment or extension of payment deadlines for bank debt payments requested by Vantico. (Letter dated Jan. 20, 2003 at 3–5; Clarke Decl. ¶ 5.)

55. Despite Apollo's demand, on January 28, 2003, Vantico "obtain[ed] the consent of the majority of the senior debt holders" for "waivers and modifications necessary to avoid default" and appropriate extensions for payments due were obtained. (Clarke Decl. ¶ 6.) The other Banks had not agreed with Apollo that waivers should be conditioned on Resolution's being allowed to make a bid for Vantico. (See id.)

56. When the other debt-holders rejected Apollo's proposal, Vantico learned that Apollo had not yet acquired a 34% share of the Bank Debt, which would allow it to exercise veto power over certain decisions of the other Senior Banks who are the other debt-holders. (Clarke Decl. ¶ 6.) A 34% share of bank debt confers veto power because pursuant to the Credit Agreement the holders of 66⅔% of the bank debt must agree to certain major decisions of Vantico that could impair the rights of the senior debt holders. (Tr. at 163–64 (Court); Defts.' Ex. 5 ("Credit Agreement") § 14.3.)

57. Apollo returned to the market, spending approximately $140 million to purchase the additional debt that would give it veto power over certain decisions of the other debt-holders. (Kleinman Decl. ¶ 10.) These purchases were made for as much as 90% of par value or more. (Clarke Decl. ¶ 7.) These purchases followed Apollo's initial purchase of approximately $20 million, which was at a substantial discount from par. (Kleinman Decl. ¶ 10.)

58. Apollo's second round of buying, which occurred over roughly the last three business days prior to the temporary restraining order hearing on February 4, 2003 brought its share of the Senior Debt to approximately 35%. (Kleinman Decl. ¶ 10.) This provided Apollo with the share of bank debt needed to veto decisions requiring the vote of 66⅔% of the holders of debt.

59. By virtue of owning Senior Debt, the Senior Credit Agreement gives Apollo/Resolution rights of access to detailed pricing, financial, and strategic information of Vantico, including business plans, financial forecasts, and the amount of cash that Vantico has in the bank. These rights are expressly provided to all of the Senior Banks under ¶ 14 of the Senior Credit Agreement. (Credit Agreement § 14; Tr. at 167–68 (Court).)

60. Paragraphs 14.1.1 and 14.1.2 of the Senior Credit Agreement require Vantico to provide the Banks, as well as Apollo, with financial account reports, balance sheets, and profit and loss and cash flow statements on an ongoing basis. (Credit Agreement § 14.1.1, § 14.1.2.)

61. Paragraph 14.1.4 of the of the Senior Credit Agreement goes further, requiring Vantico to provide the Banks with an operating budget for each year, complete with a "comparison of the information, estimates, forecasts

and projections contained therein with any relevant information, estimates, forecasts and projections contained in the Accountants' Report and the Business Plan, including an analysis justifying any variations therefrom." (Credit Agreement § 14.1.4; Tr. at 170–71 (Court).)

62. Paragraph 14.1.5 of the Senior Credit Agreement provides the open-ended requirement that Vantico make available any "information, estimates, forecasts or projections," which the Senior Banks may request, provided it has them in its possession or it can produce them "without unreasonable cost or use of management time." (Credit Agreement § 14.1.5.) Pursuant to that provision, Apollo obtained, for example, information regarding Vantico's projected sales and profit margins for the next three years (Pls.' Ex. 21 ("Project VolcanoReview of Short–Term Cash Flow and Treasury Operations") at 14.), and a detailed report prepared by Ernst & Young for the Banks setting out, among other pieces of confidential information, Vantico's plans for operational improvements (Pls.' Ex. 22 ("Oct. 18, 2002 Ernst & Young Report") at 17–18), key contract terms (*Id.* at 19–22), business strategy (*Id.*, vol. 2, at 18–19), demand and input cost projections (*Id.*, vol. 2, at 26–27), and other competitive forces. (*Id.*, vol. 2, at 28.)

63. The information received by Apollo as a bank debt holder has not been shared with any officer or employee of Resolution. (Schlanger Decl. ¶ 3.)

64. No evidence has been produced to suggest that the principals and partners of Apollo who serve on Resolution's Board of Managers have used any commercially sensitive information of Vantico to the competitive advantage of Resolution. In fact, Marvin Schlanger, the Chairman and Chief Executive Officer of RPP, was not even aware of the bank debt purchases made by Apollo until those purchases were well underway. (Schlanger Decl. ¶ 2.)

*Possible Acquisition of Vantico by Apollo*

65. On February 7, 2003 Apollo renewed its request that Vantico consider an auction alternative to the voluntary restructuring. Apollo offered to extend Vantico a loan of CHF 25 million. (Defs.' Exh. 6 ("Letter dated Feb. 7, 2003") at 2.) This offer was rejected by Vantico. (Tr. at 183–84 (Court).)

66. Apollo has likewise offered inducements to Vantico's majority equity holder, MGPE, to agree with Apollo's attempt to move forward with an alternative restructuring proposal. (MacIntosh Suppl. Decl. ¶¶ 3–4.) There is no evidence that those inducements have been accepted.

67. There is currently no acquisition of Vantico by Apollo or Resolution that is either imminent or pending.

68. Vantico has repeatedly rejected offers to consider alternative restructuring proposals, including an auction process favored by Apollo. (*See, e.g.*, Tr. at 174–75, 176 (Court).)

*Vantico Insolvency*

69. As of at least February 3, 2003, Apollo's holdings of the Senior Bank Debt are sufficient to block any proposal to restructure. (MacIntosh Suppl. Decl. ¶ 3; Credit Agreement § 20.1 (requiring majority approval to modify "any term of any Financing Document"); Tr. at 156 (Court).)

70. The plaintiffs contend that Vantico has determined that it must have "headroom," or an available cash amount plus revolving credit facilities, of CHF 50 million on a week-to-week basis, in order to have sufficient funds to pay its expenses as they come due. (Tr. at 86 (Farmakis); Tr. at 155–56, 157 (Court).)

71. On January 28, 2003 Vantico made an amortization payment of CHF 25 million as part of the payment due to debt-holders pursuant to the Credit Agreement. (Tr. at 161–62 (Court).)

72. Vantico could avoid any risk of falling below the necessary headroom threshold by agreeing to a Bridge Loan from Apollo, conditioned on the consideration of an auction proposal.

73. The repeated efforts made by Apollo to provide additional Bridge Loans and financing, conditioned on Vantico's consideration of an alternative restructuring proposal, have been consistently rejected. (*See, e.g.,* Defts.' Exh. 1 ("Letter dated Feb. 11, 2003"); Tr. at 173–74; 175–76 (Court).)

74. The exclusivity agreement signed by Vantico and MatlinPatterson prohibits Vantico from engaging in alternative restructuring proposals. (Tr. at 174–79; 184–85 (Court).) The plaintiffs have not submitted the exclusivity agreement to the Court, although there is testimony about it.

75. Should the Voluntary Restructuring Plan not go forward, the defendants would have a substantial portion of the CHF 15 Million otherwise payable in March because it would not have to pay the success fees or other expenses contingent on closing the proposed restructuring.

76. The Vantico Board of Directors currently has no firm views about whether it will commence insolvency proceedings and does not have any plans to commence insolvency should the present motion for a preliminary injunction be denied. (Tr. at 186–88 (Court).) The Board of Vantico is also considering alternatives to meet the cash needs of the company at the end of February and during March. (Tr. at 187 (Court).)

77. Vantico intends, at some time, to conduct an asset swap with AirProducts, and as part of such a transaction to pay close to $6 million. Should Vantico not proceed with this transaction, it would have an additional $ 6 million with which to continue its operations. (Tr. at 91–92 (Farmakis).) This transaction has not yet been approved by the Vantico Board of Directors and is not included in Vantico's cash flow projections submitted in connection with this motion. (*See* Pls.' Exh. 16 ("Vantico Group Consolidated Cash Flow Forecast 13 Weeks Ending 20 April 2003").)

*Vantico's Ability to Compete in the Marketplace*

78. The Credit Agreement gives Apollo advance notice, and the ability to block various Vantico business transactions. For example, Apollo has power to vet and approve the disposal of certain assets (Credit Agreement § 14.3.2), transfers of funds between different entities in the Vantico Group (Credit Agreement § 14.3.10), corporate restructuring (Credit Agreement § 14.3.4), new loans (Credit Agreement § 14.3.6), and new acquisitions (Credit Agreement § 14.3.9).

79. Vantico's U.S. operation has entered into an agreement in principle with

Air Products in which Vantico would exchange some non-strategic assets for an Air Products line of specialty epoxy resin which directly competes with Resolution. (Tr. at 90 (Farmakis).) Because the two product lines are not equally valued, Vantico must also pay Air Products roughly $6 million. (Tr. at 91–92 (Farmakis).)

80. Vantico has been attempting to sell two loss-making businesses. Vantico also plans a major reorganization and cost savings measure in Europe, and has been asked by lenders to consider creating separate pools of indebtedness. These transactions would require prior notification and approval from Apollo. (Tr. at 164–65 (Court).)

81. With respect to the Air Products transaction, the CFO of Vantico Justin Court testified that he had no knowledge of the Air Products Transaction. (Tr. at 159 (Court).)

82. In addition, there has been no letter of intent signed with respect to the Air Products transaction, and one has not been drafted. (Tr. at 95–96 (Farmakis).) The Board of Vantico has also not reviewed any AirProducts proposal. (Tr. at 96 (Farmakis).)

83. With respect to the proposed sale of loss making businesses, those transactions are, at this time, merely being "contemplated" by Vantico and are not sufficiently concrete so as to permit any evaluation of the likelihood of Apollo's ability to block such transactions.

84. There is no evidence that Apollo engaged in, or will engage in, behavior that disparages Vantico in the marketplace. The concerns expressed by Vantico's suppliers regarding Vantico's financial condition and ability to pay its bills arose, not due to actions of Apollo, but resulted from the fact that Standard & Poors, in November, 2002, downgraded Vantico's Debt to a "D" rating. (Tr. at 86–87, 102–03 (Farmakis).) Exxon, for example, expressed concerns and threatened to require cash on delivery. (Tr. at 87 (Farmakis).)

85. Concerns expressed by the buyers of Vantico's products were not based on the activities of Apollo, and were concerns regularly expressed by consumers of epoxy resins, often in an attempt to force sellers to reduce price. (Tr. at 81, 103–04 (Farmakis).) Vantico acknowledged that it has the means to reassure customers about Vantico's finances and has taken steps to do so, and that many problems with buyers arose from Vantico's financial condition, which was precarious long before Apollo purchased bank debt. (Tr. at 104–05 (Farmakis).)

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of the claims because this case arises under the laws of the United States regulating commerce and protecting commerce against restraints of trade and monopolies. 28 U.S.C. §§ 1331 and 1337; 15 U.S.C. § 26.

2. Venue is proper in this district. 15 U.S.C. § 22; 28 U.S.C. § 1391(b).

*Standard for a Preliminary Injunction*

3. The standard of proof to be applied in determining whether the moving party has satisfied the elements for a preliminary injunction depends on whether the party is seeking a mandatory or prohibitory injunction. *See Tom Doherty Assoc.,*

*Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir.1995).

4. A preliminary injunction is prohibitory if it "seeks only to maintain the status quo pending a trial on the merits." *Id.* In contrast, an injunction is a mandatory injunction, if the injunction will either "alter the status quo by commanding some positive act" or if the injunction provides the moving party with "substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Id.*

5. If the injunction sought is prohibitory, to prevail on the motion for a preliminary injunction, the moving party must establish " '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.' " *AIM Int'l Trading, LLC v. Valcucine SpA.*, 188 F.Supp.2d 384, 387 (S.D.N.Y.2002) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)(per curiam)); *see also Tom Doherty Assoc.*, 60 F.3d at 33. On the other hand, if a party seeks a mandatory injunction, the party must satisfy a higher standard and the preliminary injunction should be granted "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* (quotations omitted).

6. The preliminary injunction sought by Vantico in this case is a mandatory injunction, and therefore the injunction should be granted only if it satisfies the heightened standard. Vantico's requested injunction requires that for any transaction requiring approval of debt-holders, Apollo be forced to vote its share of the Senior Debt in a manner consistent with the other debt-holders. This is a clear alteration of the status quo, because currently there is no requirement that Apollo vote its shares in the bank debt consistent with any other bank or investor, and it is currently free to reject or accept any proposal requiring Apollo's approval. Moreover, although Vantico argues that requiring Apollo to vote its debt holdings in a manner consistent with the other debt-holders is essential to restore the balance of market power that existed before Apollo acquired any Vantico debt, such an injunction would be an alteration of the status quo because it would deprive Apollo of contractual rights it currently has pursuant to the Credit Agreement. Finally, it is clear that the impetus behind the motion for a preliminary injunction and the immediate request for relief is an effort to obtain implementation of the MatlinPatterson proposed restructuring as opposed to alternatives sought by Apollo. If the MatlinPatterson proposal proceeds, and Apollo's position is vindicated in subsequent proceedings in this litigation, it will be impossible to return the parties to their original pre-injunction positions, because the MatlinPatterson proposal will already have gone forward, funds will have been expended, and the Apollo debt will have been diluted. In order to prevail on the motion for a preliminary injunction, Vantico, therefore, must satisfy the "clear showing."

7. In any event, Vantico has failed to satisfy the elements necessary for granting the preliminary injunction, under the lower standard, and conse-

quently, it cannot also satisfy the "clear showing" standard for a mandatory injunction.

### Irreparable Harm

8. Vantico has failed to show that the failure to enter a preliminary injunction, would cause irreparable harm to Vantico. "[T]he mere possibility of harm is insufficient to justify granting a preliminary injunction." *Shuster v. Nassau County*, 948 F.Supp. 282, 284 (S.D.N.Y.1996).

### Misuse of Confidential Business Information

9. There has been an insufficient showing that the failure to block Apollo's access to sensitive competitive information would cause irreparable harm to Vantico. Some of the information that Apollo received about Vantico and its operations was obtained during the course of merger negotiations and talks that took place during 2002. (FOF ¶¶ 31, 36.) This information was covered by a confidentiality agreement and there has been no evidence presented that the terms of the confidentiality agreement have been breached. (FOF ¶ 37.)

10. Moreover, with respect to information Apollo has obtained during the course of purchasing Vantico debt, and to which it is entitled under the Credit Agreement, there has been no showing that this information has been communicated to key personnel of Resolution, that Resolution employees were even aware that Apollo has such information, or that the information has been used to the competitive disadvantage of Vantico. (FOF ¶¶ 62–67.)

### Risk to Vantico's Ability to Compete

11. There has also been an insufficient showing that Apollo's present acquisition of Vantico debt, along with the ability to block the Voluntary Restructuring Plan, would cause irreparable harm to Vantico's ability to continue to operate in the marketplace.

12. Any of the proposed asset swaps and other transactions that Vantico may pursue are too contingent and hypothetical, and it is not possible to determine what actions, if any, Apollo or other senior lenders would take with respect to these transactions. (*See, e.g.*, Tr. at 96–97 (Farmakis) (acknowledging that no information was know with respect to the Senior Banks' position towards the AirProducts transaction); *see* FOF ¶¶ 85–87.) The only transaction as to which the plaintiffs presented any concrete particulars was the proposed swap of assets with AirProducts. As to that transaction, there is no signed letter of intent, no approval by the Vantico Board of Directors, no approval by the senior lenders, and no time table reflected in Vantico's cash flow analysis. Any possible hindrance of this transaction could not be immediate and no irreparable injury would occur without a preliminary injunction. Therefore, any risk of irreparable harm to Vantico's ability to remain a competitor to Resolution in the relevant epoxy resin markets is not sufficient enough to warrant a preliminary injunction.

13. In addition, there is no evidence that Apollo has manipulated consumers and suppliers of Vantico to obtain competitive advantage, and any such problems were present long before Apollo began to acquire the debt of Vantico. (FOF ¶ 89.) There is no

evidence that Apollo engaged in, or will engage in, behavior that disparages Vantico in the marketplace. The concerns expressed by Vantico's suppliers regarding Vantico's financial condition and ability to pay its bills arose, not due to actions of Apollo, but resulted from the fact that Standard & Poors, in November, 2002, downgraded Vantico's Debt to a "D" rating. (FOF ¶¶ 88–89.) Moreover, by virtue of its investment in Vantico through Fund V, Apollo has an interest in maintaining the competitive viability of Vantico. There is no evidence that Apollo would risk this investment by attempting to sabotage Vantico.

### Risk of Acquisition by Apollo

14. Because Vantico has rejected the option of an auction process, there is currently no acquisition of Vantico by Apollo or Resolution that is either imminent or pending. (FOF ¶¶ 52, 70, 71.) Moreover, any acquisition of Vantico by Apollo or Resolution would trigger reporting obligations under the Hart–Scott–Rodino Antitrust Improvements Act of 1976. While the plaintiffs speculate that it may be theoretically possible to structure some transaction that would escape regulatory review, no particulars of any such transaction have been placed before the Court. All hypothetical acquisitions that would not give rise to such regulatory review obligations are simply not before the Court, and no evidence has been provided that the hypothetical transactions have any possibility of going forward or are being contemplated by the defendants. Furthermore, as the defendants point out, the plaintiffs could return to Court if any such proposal were ever presented.

15. Apollo does not wish to liquidate the operating businesses of Vantico. In fact, a Vantico liquidation would be harmful to Apollo because although such a liquidation might potentially benefit investors in Fund IV, who own Resolution, it would jeopardize the investment of the investors in Fund V, who hold $160 million of the senior debt of Vantico. There is no evidence to establish that it would be in Apollo's interest to liquidate Vantico or that the principals of Apollo who owe fiduciary obligations to the investors in Fund V which holds the Vantico debt, would ignore those obligations and jeopardize the viability of Vantico. In fact, the evidence indicates that it would be in the best interest of Apollo to maintain Vantico as a going concern, because that would maximize Apollo's ability to recover the $ 160 million in Vantico's debt. (Kleinman Decl. ¶ 18.)

### Risk of Insolvency

16. Although the plaintiffs contend that Vantico has determined that it must have "headroom," or an available cash amount plus revolving credit facilities, of CHF 50 million on a week-to-week basis, in order to have sufficient funds to pay its expenses as they come due, the evidence does not show that Vantico's cash balances will imminently fall below the necessary threshold as a result of actions engaged in by either Apollo or Resolution

17. Any risk of insolvency created by the Voluntary Restructuring Plan, including the inability to consider alternative proposals for maintaining Vantico as a going concern, do not result from the actions of Apollo or Resolution but stem from the actions

of Vantico, including its signing of the exclusivity agreement. (FOF ¶¶ 49, 78.) Vantico cannot rely on its own actions to create the risk of irreparable injury which it then seeks to avoid by the issuance of a preliminary injunction. *See, e.g., Roberts v. Atlantic Recording Corp.,* 892 F.Supp. 83, 88 (S.D.N.Y.1995); *First African Trust Bank Ltd. V. Bankers Trust Co.,* No. 92 Civ. 4900 (RPP), 1992 WL 276833, at *5 (S.D.N.Y. Sept.28, 1992).

18. The balance sheets of Vantico reflect the fact that Vantico's supposed liquidity crisis has resulted partially from its own actions, including entering into an exclusivity Agreement with MatlinPatterson which prevents Vantico from engaging in other proposals, promised payments that involve the payment of close to $15 million primarily in success fees for the completion of the MatlinPatterson proposal, the acquisition of additional assets and product lines that require payment of cash as part of those transactions, and the consistent rejection of the Bridge loans offered by Apollo. (FOF ¶¶ 74, 77–79, 81.)

19. In addition, there are currently no plans to declare bankruptcy should this motion for preliminary injunction be denied. (FOF ¶ 80.)

20. Vantico's claims of immediate insolvency if the preliminary injunction is not granted lack credibility. The lack of immediacy of any risk of insolvency is exemplified by the failure of Vantico to enter insolvency after the denial of the motion for a temporary retraining order. Counsel for Vantico indicated that a TRO requiring Apollo to vote its share of the bank debt consistent with the votes of the other Senior–Bank holders was necessary for the Voluntary Restructuring Plan to go forward and for Vantico to avoid immediate bankruptcy. The Voluntary Restructuring Plan provides either Vantico or its financial advisors, Close Brothers, must, "not more than two Business Days after the end of each week... certify that, in their opinion, the Restructuring Discussions are progressing in a manner that would enable a restructuring proposal to be completed in a reasonable time and in any event no later than 28 February 2003." (Clarke Decl. ¶ 8.) Plaintiffs' counsel indicated that Apollo needed to give its consent that it would not block the Voluntary Restructuring Plan prior to 1:00 GMT on February 4, 2003, otherwise Close Brothers would not certify the fact that Restructuring Discussions were progressing, and Vantico would enter bankruptcy. Apollo agreed to waive any objections at the hearing for the TRO; however, Apollo's consent and waiver was not communicated to Close Brothers by the appropriate time. (*See* Letter of Lauren Albert dated Feb. 7, 2003 at 1–2.) Yet, there was no insolvency proceedings that began, and the Voluntary Restructuring Plan continues to move forward. This series of events highlights the fact that the purported risks of any alleged impending insolvency are unreliable.

21. Because of these circumstances, the lack of a contemplated firm insolvency process, the availability of alternative sources of cash, and the problems created by Vantico's prior business decisions, there is no risk of immediate insolvency of Vantico. In addition, there has been no demonstration that the insolvency risks alleged are created by the acquisition of Vantico debt by Apollo. The risk of potential

insolvency resulting from the actions of Apollo are too unsubstantiated to warrant the granting of a preliminary injunction.

### Likelihood of Success on the Merits

22. Vantico has also failed to show that that there is a likelihood of success on the merits on any of its claims under the federal antitrust laws.

### Section 7 of the Clayton Act

23. Section 7 of the Clayton Act provides that "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

24. Section 7 is "intended to arrest anticompetitive acquisitions in their incipiency." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

25. It is well established that "[a] company need not acquire control over another company to violate the Clayton Act." *Denver & Rio Grande W.R. Co. v. United States*, 387 U.S. 485, 501, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967). Rather, the question is whether "there is a reasonable probability that the acquisition is likely to result in the condemned restraints." *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 607, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

26. Although § 7 has traditionally been applied in the context of equity acquisitions, Vantico argues that in this case Apollo's acquisition of approximately 35% of the senior debt of Vantico triggers the application of § 7, because it is sufficient to allow Apollo to lessen the competitive vigor between Vantico and Resolution and thereby to violate § 7 of the Clayton Act.

27. The mere fact that a company's horizontal competitor may have acquired the debt of the company and is a creditor is not a sufficient basis by itself to conclude that such an acquisition is a violation of § 7 of the Clayton Act. *Metro–Goldwyn–Mayer Inc. v. Transamerica Corp.*, 303 F.Supp. 1344, 1350 (S.D.N.Y.1969) (noting that such "debtor-creditor" relationships are not categorically prohibited by antitrust laws). However, under certain circumstances, there is a sufficient probability of anti-competitive effects arising from such a relationship that the relationships would constitute a violation of § 7 of the Clayton Act. *Id.* at 1350–51; *see, e.g., Mr. Frank, Inc. v. Waste Mgmt., Inc.*, 591 F.Supp. 859, 867 (N.D.Ill.1984) (finding material issue of fact as to whether competitor's creditor status constituted § 7 violation). In order to determine whether the ownership of such debt interest should be enjoined due to a probability of such anti-competitive effects "depends upon whether such probability is revealed by surrounding circumstances, including the expressed purpose of the relationship, the debtor's

solvency or insolvency, the terms and size of the loan, the percentage it bears to the debtor's entire debt and capital structure, [and] the existence or non-existence of other contracts or relationships between the parties." *Metro–Goldwyn–Mayer Inc.*, 303 F.Supp. at 1351.

28. In *Metro–Goldwyn–Mayer* ("MGM"), MGM was the subject of a partial cash tender offer for a working control interest in its stock by the Tracy Investment Company ("Tracy") and Tracy was loaned a substantial amount of the funds for the tender offer by Transamerica Corporation ("Transamerica"), which owned a competitor of MGM. The Court found that the mere fact that Transamerica would become a creditor of a controlling MGM shareholder did not create a probability of anti-competitive effects "without proof of circumstances indicating a likelihood that Transamerica or its affiliates either intend or would be able and likely to use pressure or leverage upon Tracy to influence MGM's policies or decisions, or would obtain confidential information from MGM that would be of value to United Artists." *Id.* at 1350–51. The Court proceeded to deny MGM's motion to enjoin Transamerica and Tracy from proceeding with the tender offer creating the debtor-creditor relationship. *Id.* at 1352. The Court, however, did grant limited relief precluding the pledge or delivery to Transamerica or its affiliates of any MGM shares acquired by Tracy and prohibiting the sharing of certain sensitive information between Transamerica and its affiliates on the one hand and Tracy, MGM and its affiliates on the other hand. *Id.*

29. In this case, based on the very limited record now before this Court, the circumstances created by the acquisition by Apollo of a 35% interest in the Vantico senior debt does not establish a probability of anti-competitive effects. The fact remains that although Vantico alleges otherwise, there has been no showing that Apollo or Resolution has misused confidential information to the detriment of Vantico. There is also scant evidence that there are any important asset acquisitions or transactions that are pending and that will be blocked by Apollo. There is also no evidence that Apollo intends or would be likely to pressure Vantico in Vantico's competitive business decisions. Apollo's interest in Vantico is a creditor's interest in assuring that the value of Apollo's debt is protected and that any increase in the value of the debt can be realized.

30. Although the Credit Agreement grants Apollo certain powers to block various transactions or restructuring proposals, Apollo has little incentive to force Vantico to become insolvent or to prevent it from continuing as a going concern. As explained above, while the insolvency of a competitor might be of some benefit to the investors in Fund IV, which controls Resolution, it would significantly harm the investors in Fund V, and risk the recoverability of Fund V's $160 million investment. Consequently, Apollo has little or no incentive to engage in the anti-competitive behavior that is envisioned by Vantico. Moreover, there is no evidence at this point that Apollo's principals will ignore their fiduciary responsibilities to the investors in Fund V by jeopardizing the viability of Vantico.

31. Finally, the concerns about Vantico's insolvency have been present for some time, and the underlying cir-

cumstances that raise those concerns, including liquidity problems have arisen from Vantico's own strategic decisions, including the decisions to reject alternative financing and to pay success fees to the MatlinPatterson group, and do not arise from the acquisition of debt by Apollo, which is a very recent event.

32. It should be emphasized that the Court is required to assess the likelihood of success based on a very preliminary record and before any discovery has been undertaken. The expedition has been caused by the plaintiffs' request for a decision, less than three weeks after the case was filed, so that they could seek to have their preferred method of restructuring implemented. Based on the record before this Court, Vantico has not shown that the acquisition of 35% of Vantico's senior debt by Apollo has created the probability of anticompetitive effects and unlawful restraints of trade prohibited by the Clayton Act.

### Section 2   of the Sherman Act

33. Section 2 of the Sherman Act makes it illegal for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

34. To establish a claim for attempted monopolization, a plaintiff must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports*

*v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

35. Vantico has not established that Apollo's acquisition of distressed Vantico debt satisfies these elements of a § 2 Sherman Act claim.

36. Vantico bases its § 2 claims on several alleged activities engaged in by the Apollo, including its alleged attempts to undermine Vantico's relationship with important consumers, Apollo's attempts to thwart Vantico's Voluntary Restructuring Plan, and its misuse of confidential information relating to Vantico's business practices and its pricing structures.

37. As explained above, these allegations either have no merit or are merely based on hypothetical situations which the Court could not conclude were likely to occur. Moreover, on the current record the Court could not conclude that Apollo's conduct was done with a specific intent to monopolize. The relationship between Vantico's customers and suppliers began to deteriorate before Apollo began to acquire Vantico debt, and there is no evidence that Apollo engaged in predatory conduct. (FOF ¶¶ 88–89.) There is also no basis from which to conclude that Apollo or Resolution misused the information Apollo received under the confidentiality agreement or by virtue of the rights conferred in the Credit Agreement. (FOF ¶¶ 57, 66–67.) Finally, there is no basis to conclude that Apollo's attempt to "thwart" a Voluntary Restructuring Plan is predatory or anticompetitive conduct or an attempt to monopolize. The auction process represents a viable and legitimate means for Apollo to recover the value of its debt holdings, (FOF ¶¶ 50–53), and suggests Apollo's oppo-

sition to the Voluntary Restructuring does not arise out of an intent to monopolize but out of a desire to make profits on its distressed debt investments.

38. The fact also remains that Vantico and Apollo vigorously, over a period of many months, pursued a merger between Vantico and Resolution through Apollo. (FOF ¶¶ 29–38.) The existence of these negotiations belies Vantico's present claim that it is clear that no combination could be constructed consistent with the antitrust laws. These merger negotiations also belie Vantico's current claim that Apollo's ownership of 35% of the senior debt of Vantico runs afoul of the well-established antitrust principles embodied in § 2 of the Sherman Act.

*Section 1   of the Sherman Act*

39. Under Section 1 of the Sherman Act, "[e]very contract ... in restraint of trade or commerce among the several States ... is hereby declared to be illegal." 15 U.S.C. § 1.

40. Because § 1 of the Sherman Act looks to the probable effects of an agreement, there is no substantive difference between the standards underlying a violation of § 7 and § 1. *See United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1281–83 (7th Cir.1990) (Posner, J).

41. The plaintiffs alleged that because Apollo's purchase of the bank debt of Vantico gave it access to confidential information enabling Apollo to control the everyday business decisions of Vantico, the defendants have violated § 7 of the Clayton Act, and therefore, § 1 of the Sherman Act. However, as explained above, (Conclusions of Law

("COL") ¶¶ 21–30.), the plaintiffs have failed to establish that the defendants have misused or are likely to misuse any information. In addition, because the plaintiffs have not established a likelihood of success on the § 7 Clayton Act claim, they have not established a likelihood of success on the § 1 Sherman Act claim. (*See id.*)

*Balance of Hardships*

42. The plaintiffs have not established that the balance of hardships tips in their favor.

43. If the mandatory preliminary injunction is denied, stakeholders of Vantico will likely have the opportunity to consider whether the sale of Vantico's operations in an auction process is better than the MatlinPatterson debt for equity restructuring plan or whether some other plan should be implemented.

44. The public will not be injured in the absence of a preliminary injunction because there is no imminent danger of either a demise of Vantico's operations or a combination of Resolution and Vantico occurring without antitrust regulatory review.

45. It has become clear that this litigation is indeed an attempt by the plaintiffs, financed by the MatlinPatterson Group to use the antitrust laws as a means to force Apollo to vote its debt consistent with the wishes of other senior debt-holders, even if that vote is in favor of the Voluntary Restructuring Plan, with which Apollo disagrees. This litigation is being funded by the MatlinPatterson Group and MatlinPatterson is set to recover a significant success fee should the Voluntary Restructuring Plan be implemented. The existence of the exclusivity agreement and the success

fees also confirm that Vantico's interest is aligned with MatlinPatterson, and that Apollo poses more of a threat as an investor seeking alternative restructuring proposals than as a company seeking to eliminate a horizontal competitor or to monopolize a market. Moreover, it is undisputed that Vantico considered and actively pursued a merger with Apollo and Resolution during 2002. Yet, this same combination pursued previously has now given rise to allegations of antitrust violations and predatory behavior. There is no evidence of an intent to monopolize or to destroy competition, and the motion for a preliminary injunction appears to be an attempt to use the Court to favor one set of financial transactions over another.

46. Given these circumstances, the balance of the equities does not favor Vantico.

## CONCLUSION

For the reasons explained above, the plaintiffs have failed to establish, that there is a sufficient risk of irreparable harm, that there is a likelihood of success on the merits, or that the balance of the equities favors the plaintiffs. Consequently, the plaintiffs' motion for a preliminary injunction is denied.[1]

**SO ORDERED.**

---

1. These Findings of Fact and Conclusions of Law were originally issued on February 26, 2003 but were filed under seal to provide the parties the opportunity to indicate to the Court whether there were portions of these findings that contained commercially confidential non-public information that should remain sealed. The papers filed in connection with this case were originally filed subject to a protective order and were all filed under seal. Because there are no portions of these Findings of Fact and Conclusions of Law that contain information that would justify that information remaining under seal, and the parties having pointed to no findings that should remain under seal, the sealing order with respect to the February 26, 2003 Findings of Fact and Conclusions of Law is lifted.